## Thompson and others *against* Brown, Fay, and others.

The Court of Chancery may appoint a person to carry on trade, for an infant partner.

Where an administrator of a deceased partner, without applying to this Court for its direction, *bona fide*, permitted the surviving partner to sell the joint stock, in the usual course of the trade, for the joint benefit of himself and the intestate's estate, he was held not to be responsible to the creditors for any loss; but he is *personally* liable for any debts contracted by such assumed partner.

So, if he puts into the hands of the surviving partner, *assests* which he had in his own hands, and under his own control, to trade with, he will be answerable for the loss.

Executors and administrators, or trustees, acting with good faith, and without any wilful default or fraud, will not be responsible for the loss which may arise.

A creditor may come into a Court of Chancery against an executor or administrator, for a discovery and distribution of assets.

Upon the usual decree to account, in a suit by one or more creditors against an executor or administrator, either separately for themselves, or specially, on behalf of themselves and all other creditors, the decree is for the benefit of all the creditors, and in the nature of a judgment for all; and all the creditors are entitled, and should have notice for that purpose, to come in and prove their debts before the master, and they are to be paid by the executor or administrator, rateably, after judgment creditors are satisfied, without preference or regard to the legal priority of specialty over simple contract creditors. And from the date of such decree, and on a due disclosure of assets, an injunction will be granted, on the motion of either party, to stay all proceedings of any of the creditors at law.

Creditors may file a bill against heirs and devisees for an account for the sale and distribution of the real estate descended, to make good any deficiency of the personal assets. But the real estate will not be directed to be sold, until the amount of the debts, and the deficiency of the personal estate, have been first ascertained.

And it is no objection to a sale of the real estate, for the payment of debts, that the heirs are infants.

A widow and administratrix, who under her claim of dower, and as guardian to her infant children, had received the rents and profits of the real estate, and applied them to the necessary maintenance of

THOMPSON
v.
BROWN.

the children, prior to due notice and application of creditors, was not held to account for the rents and profits so received and expended.

December 7th.     IN 1815, and long time before, *Lemuel Brown* and *Jedediah Fay* were partners in trade, at *Owego*, in *Broome* county, and became indebted to *Kellogg & Sprague*, merchants, in *New-York*. *Brown* died on the 1st of *December*, 1815, intestate, leaving *Elizabeth B.* defendant, his widow, and nine of the defendants, his children. On the 1st *January*, 1816, administration of his estate was granted to his widow, and to the defendants, *J. McQuigg* and *A. Brown*. A judgment was, afterwards, recovered in the Supreme Court, by *K. & S.* against *Fay*, as surviving partner of *B. & F.*, for 1,945 dollars and 81 cents. In *May*, 1817, a *test. fi. fa.* was issued to the sheriff of *Broome*, which was returned *nulla bona*. In *July*, 1817, the judgment was assigned to the plaintiffs. The bill stated, that *L. B.* died seised of considerable real and personal estate ; that as partner with *Fay*, he owned a moiety of a store of goods, amounting to 7,000 dollars ; and that his administrators took possession of the undivided moiety, and by agreement with *Fay*, the administrators engaged to save him harmless against all the debts, as surviving partner, and to sell the goods on joint account. That the administrators sold the goods to persons unable to pay for them, and wasted them. That they received the rents and profits of the real estate, and took possession of the personal estate, and more than sufficient to pay the judgment debt to the plaintiffs. The bill *prayed* that the administrators of *B.* might admit assets sufficient to satisfy the plaintiffs, or set forth a true account of the personal estate of *B.*, and what part had come to their hands, and how they had disposed of the same, and make discovery of the facts relative to their connection with *Fay*; and, also, an account of the real estate of *B.*, where situated, &c. and the rents and profits which have

been received, and the claims, if any, on the real and personal estate ; and that if the personal estate be not sufficient to satisfy the debt of the plaintiff, the real estate might be sold, and all proper parties join in such sale, and so much of the proceeds thereof, as may be necessary, be applied to satisfy the debt of the plaintiffs, and for general relief.

The *answer* of the administrators of *B.* set forth a full account of the estate, real and personal, of the intestate, &c. and of the disposition of the assets which had come to their hands, and of the debts still due and unpaid. They stated the goods or stock in trade belonging to *B.* and *F.*, according to the inventory taken, amounting to 7,202 dollars and 97 cents, and the undivided moiety of which belonged to *B's* estate. They denied that they took possession thereof; but that, conceiving it would be most for the interest of all concerned, they suffered the goods to remain with *F.*, who had during the life time of *B.* the principal direction and management of the partnership concerns ; and, at his instance, on the 25th *December*, 1815, agreed, that he should keep possession of the store and goods, and sell the goods for the joint benefit of himself and of the estate of *B.* ; and they, accordingly, entered into articles of copartnership with *F.* on the same terms as *B.* and *F.* had before carried on the business, and by which *F.* was to continue it, under the firm of *Fay &c Co.*, until the partnership should be mutually dissolved. That they entered into this co-partnership with *F.* solely for the benefit of the estate of *B.*, without any intention or desire to benefit themselves, and upon the advice of counsel that they might safely do so. They denied that they had agreed to indemnify *F.*, or entered into any other agreement with him, than the one above mentioned. That *F.* continued to carry on the business, and had the sole and entire management of it. That he sold the principal part of the goods to persons who failed to pay, and converted the residue to his own use, and had never accounted to them, the administrators of *B.*, for any part thereof, and that *F.* was

insolvent. That the goods remaining with *F.* were seised under a *fi. fa.* against him, and his interest therein sold, and the residue so seised, not exceeding in value 491 dollars, were taken possession of by the defendants. That they collected some debts due to *F. & Co.* to the amount of 268 dollars, which was all they had received; that they laid out 411 dollars 51 cents of assets, for the purchase of goods, soon after the death of *B.* and also advanced, in stock, 254 dollars and 25 cents, and this stock and goods was added to the stock in trade entrusted to *F.*, and was included with the rest, and disposed of as above mentioned. They stated various debts due by *F. & Co.* which had been put in suit, amounting to 1,583 dollars 75 cents, and a bond given by *B.* in his life time to *McQuigg,* (defendant,) secured by a mortgage, amounting, principal and interest, to 2,033 dollars. That *Elizabeth B.* was entitled to dower, and as guardian to her children took possession of the real estate, and received the rents and profits, which she had faithfully applied towards the support and education of the children, though these were wholly insufficient, the annual amount not exceeding 125 dollars. That deducting the debts of *B.* paid by them, and the sums advanced by them for stock, there remained in hand only 296 dollars and 91 cents, which, with the goods of *F. & Co.* on hand, and the personal property of *B.* unsold, would not be sufficient to pay more than one third of the amount of the debts due by *F. & Co.* and *Mc Quigg's* bond; and they believed the whole real and personal estate of *B.* was not sufficient to pay those debts. The bill was taken *pro confesso* against *Fay.* The infant heirs admitted nothing; but prayed the protection and direction of the Court.

The cause was heard on the pleadings and proofs.

*E. W. King,* for the plaintiffs.

*J. A. Collier,* for the defendants.

*For the plaintiffs,* it was contended : 1. That the real estate of *Brown* was liable, and ought to be sold for the payment of the plaintiffs. 2. That the personal estate of *B.*, and a moiety of the stock in trade of *B.* and *F.* at his death, are to be deemed, under the facts and circumstances disclosed, as personal assets in the hands of the administrators of *B.* (*Toller's law of Executors,* 155.) 3. That the trade carried on by the administrators in company with *F.* was to be deemed to have been carried on for their individual benefit, and that they were chargeable with interest on the value of the assets, so put in trade. (1 *Term Rep.* 295.) 4. That the administrators were liable for the *costs.*

*For the defendants,* it was contended : 1. That the administrators ought not to be held accountable for the moiety of the stock in trade of *B.* and *F.*, left in the hands of *F.*, to be sold for the benefit of *B.'s* estate. In regard to executors and administrators, as trustees, acting for the benefit of others, Courts are extremely liberal. (*Ambler,* 219. 5 *Vesey,* 843. 1 *Madd. Ch.* 114.) They will endeavour to relieve them from any mischief, which may arise from the misapplication of the trust money. (3 *Atk.* 44 4. Though an executor or trustee may be liable for negligence, it must, as Lord Keeper *North* observes, be very supine negligence. (1 *Vernon,* 144.) It must be *crassa negligentia,* or gross negligence. (1 *Madd. Rep.* 290.) To make out the charge of gross negligence, it must show, since fraud or covin is not and cannot be pretended in this case, that the administrators have acted, or omitted to act, against their knowledge, information, or reasonable expectation ; or have taken steps, in reference to the estate of the intestate, extraordinary, unusual, and contrary to the usage of persons in the same situation, and without legal advice. (*Ambl.* 219. 4 *Ves.* 369. 2 *Madd. Ch.* 119. 128.) Nothing of this sort appears in the present case. A Court of Chancery will, sometimes, permit an executor or administrator to continue the

1820,

THOMPSON
v.
BROWN

trade, and carry it on under the advice of the Court, so as to protect him, in case of loss, even at law. Will not this Court consider that as properly done, which, on application for that purpose, it would have authorised the administrators to do? (4 *Vesey*, 369. 1 *Bro. C. C.* 368. 3 *Bro.* 60. 401. 7 *Vesey*, 150.) If, then, these administrators have acted *bona fide*, without claiming the previous permission of the Court, though in a trial *at law*, it may not afford them excuse, yet, when creditors have come into this Court for relief against them, will the Court interfere? There was no new trading; it was merely permitting the surviving partner to do, what he could have done without the consent of the administrators; to dispose of the stock in trade by a sale in the market, in the usual course of the trade, so as to close the concern in a manner supposed the most advantageous for him, and the estate of the intestate. This is not like the case of *Rogers* v. *Coleman*, (2 *Atk.* 439, 440. *Ambl.* 584. 2 *Atk.* 603.) nor the case of *Barker* v. *Parker*, (1 *Term Rep.* 287. 295.) which has been cited. That was the case of a *sole trader*; there was, therefore, no rights of a surviving partner, or any obstacle to closing the business immediately. *Fay*, the surviving partner, was the most proper person to close the concern. He was not a *stranger*, but a partner in whom the intestate had reposed unbounded confidence. (3 *Vesey*, 365.) If the administrator had sold the goods, *bona fide*, on a credit, they would not have been liable, if the purchaser had become insolvent. (4 *Dessaus. S. C. Equ. Rep.* 207.) They ought not, then, to be made liable, in this case, for entrusting the property to the management of a person who had been selected by the intestate himself for a similar trust, and who was not known, or suspected, at the time, to be insolvent, or in danger of insolvency. (3 *Atk.* 480.) The case of *King* v. *King*, (3 *Johns. Cases*, 525.) can have no application to the present case. The administrators not only acted *bona fide*, but they took the advice of counsel; and it has been

said, that if an executor takes the advice of a *lawyer* in what he does, he will not be chargeable for misconduct. (2 *Madd. Ch.* 128. 5 *Vesey*, 144.) And it is not merely where trustees act themselves, but, also, where they act by other hands, from necessity, or conformable to the common usage of mankind, that they are not answerable for losses. (2 *Madd. Ch.* 119. *Ambl.* 219. 3 *Atk.* 480. *Dickens,* 120. 3 *Vesey,* 565.) Nor is a trustee liable for having applied trust property to what has turned out a losing adventure, if done without fraud or negligence. (1 *Vesey, Jun.* 41. 2 *Madd. Ch.* 125. 3 *Bro.* 73. 2 *Bro.* 439. 1 *P. Wms.* 146. 2 *Vesey,* 83. 85. 240.) The case of *Wightman* v. *Townroe,* (1 *Maule & Selwyn,* 412.) turned on a different point from the one in the present case. 2. But should the administrators be liable, they are not chargeable with *interest.* (2 *Atk.* 439, 440. 603. *Ambl.* 584. 11 *Vesey,* 581. 1 *Vesey, Jun.* 294. 2 *Madd. Ch.* 115. 13 *Vesey,* 402.) 3. Nor ought they to be charged with *costs,* for they have not been guilty of any breach of trust, nor of fraud, or gross negligence; (13 *Ves.* 403.) and costs are always in the discretion of the Court. (1 *Johns. Ch. Rep.* 478.)

THE CHANCELLOR. The plaintiffs sue as assignees of *Kellogg & Sprague,* who were simple contract creditors of *Brown & Fay.* After the death of *Brown,* a judgment was obtained at the suit of *K. & S.* against *F.* as surviving partner, and an execution was issued against his property, and returned *nulla bona. F.* is admitted to be insolvent, and the bill is against the administrators and infant heirs of *Brown;* it calls upon the former to discover and account for the personal estate, and of *Brown's* share of the stock in trade belonging to the firm of *B. & F.*, and what agreement and dispositions in respect to it, were made with *F.* the survivor. If the personal estate should prove insufficient, the bill seeks a discovery and sale of the real estate of *B.*, and an account of the rents and profits.

*1820.*

THOMPSON
v.
BROWN.

The infant heirs of *B.* admit nothing, and submit themselves to the protection of the Court. But the administrators make a full and frank disclosure of the real and personal estate, and the manner in which they have disposed of the latter, and they state an account of the debts still due and unpaid. By this answer it appears, that the joint stock in trade of *B.* & *F.*, at the death of *B.*, amounted in value to 7,202 dollars and 97 cents, and of which *B.'s* undivided moiety was 3,601 dollars and 45 cents. They state that they did not take this undivided share into their possession, but suffered *F.* to retain possession, and to go on and sell the joint stock according to the usual course of the trade for the joint benefit of *F.*, and of the estate of *B.* They aver, that they did this without any intention or wish of personal benefit, and upon the advice of counsel ; and because they deemed it a safe step, and best for the estate of *B.*, and the interest of the infants, and particularly as *F.* possessed, during the life time of *B.*, his confidence, and had been entrusted by him with the principal care and direction of the partnership concern. The administrators set forth the articles of agreement which they, in their representative character, entered into with *F.*, for the continuation of the partnership for the purposes aforesaid, and for none other. They admit, that *F.*, under that agreement, continued the business by selling the goods for the benefit of himself, and of the defendants, as administrators, and that he had the entire management of the store, and sold on credit to persons who did not pay, and that the proceeds have mostly been lost or converted by *F.* to his own use. They state, that he has never accounted to them, and is reputed insolvent, and that they have only received of the remains of the stock in trade to the amount in value of 491 dollars, and of debts so created, to the amount of 268 dollars. They admit further, that they advanced to *F.*, shortly after the death of *B.*, for the use of the store, assets in the shape of cash, and stock, to the amount of 665 dollars and 76

cents. They then give a satisfactory account of the amount and disposition of the residue of the assets, and of the charges thereon, and they, also, exhibit an account of the real estate descended to the heirs of *B.*, and of an incumbrance thereon.

The only inquiry in the case would seem to be concerning the proper directions to be given to the Master, on the reference to take and state an account; and a principal question is, whether the administrators are to be held personally responsible for the waste and loss of the assets so entrusted to *Fay* to be sold.

This was not a new and distinct original trading with the assets, voluntarily entered into by the administrators. They found a store of goods in possession of a surviving partner, and they had no other alternative, but either to suffer him to go on and sell upon the usual terms, and under a continuation of the confidence bestowed upon him by the intestate, or to divide the goods, and sell the share of *B.* at auction. The latter would have been a perfectly safe course for them, but, probably, most persons, under like circumstances, and with the same anxiety for the interest of all concerned, would have deemed it best that the surviving partner should go on and close the business in the usual course of the trade. It is said, that a Court of equity will sometimes appoint a person to carry on a trade for the benefit of an infant partner; (*Montagu on Partnerships*, 187. and *Sayer* v. *Bennet*, there cited ;) and Lord *Mansfield*, in the case of *Barker* v. *Parker*, (1 *Term Rep.* 295.) observed, that he remembered many instances of trade being carried on under the direction of the Court of Chancery. But the case of *Wightman* v. *Townroe*, (1 *Maule & Selw.* 412.) is one in point, in which executors went on imprudently, and under the great risk alluded to by Lord *Mansfield*, as these defendants have done, without any such protection, and continued the share of the property of an infant daughter of the testator, in a trade in which the testator had been a part-

A Court of equity will, sometimes, appoint a person to carry on a trade for the benefit of an infant partner.

1820.

THOMPSON
v.
BROWN.

ner. The executors in that case left the business entirely to the management of the surviving partner, and solely for the benefit of the infant. The only question made in the. K. B. was, whether the executors were not personally liable, *as partners,* for a debt contracted by the survivor, for the use of the new firm, and they were held to be liable. That was a very different question from the one before me, and resting on very different grounds. An executor may be legally bound as a dormant partner for a credit given to the firm, though the partnership be assumed in the disinterested performance of a trust, and yet not be equitably chargeable as a trustee to creditors of the testator, for a loss of the property.

If an administrator of a deceased partner, *bona fide,* permits the surviving partner to sell the stock in the usual course of the trade, for the joint benefit of himself, and the estate of the intestate, they will not be held responsible to creditors for any loss to the estate; but they, thereby, render themselves *personally* liable for debts contracted by such assumed partner.

The administrators acted in this case in good faith. There is no pretence of *mala fides.* They reposed confidence where the intestate had before reposed it, and acted exclusively for the interest of others. It was, at most, but an error of judgment, and a want of sharp sighted vigilance. And it would have the appearance of great rigour, and be hardly reconcilable with the doctrines of the Court, to make them responsible for the goods so wasted by the surviving partner. They run sufficient hazard in exposing themselves to personal responsibility for debts contracted by their assumed partner, and from which their representative character would not have protected them ; and, I conclude, that the mere fact of leaving the undivided portion of the goods in store, and in the possession of the surviving partner, to be sold for joint benefit, is not, of itself, sufficient to charge them with the loss.

This Court has always treated trustees acting in good faith with great tenderness.

In *Knight* v. *The Earl of Plymouth,* (3 *Atk.* 480. *Dickens,* 120.) a receiver had deposited money with a banker of good credit, who afterwards failed, and as he was not chargeable with any wilful default or fraud, he was not held responsible for the loss of it. The observations of

Lord *Hardwicke* are strong and pointed. " Suppose," he observes, " a trustee having in his hands a considerable sum of money, places it out for the benefit of the *cestui que trust*, in the funds which afterwards sink in their value, or on a security at the time apparently good, and which afterwards turns out not to be so, was there ever an instance of the trustees being made to answer for the actual sum so placed out? I answer, no. If there was no *mala fides*, nothing wilful in the conduct of the trustee, the Court will always favour him. For as a trust is an office necessary in the concerns between man and man, and which, if faithfully discharged, is attended with no small degree of trouble and anxiety, it is an act of great kindness in any one to accept of it. To add hazard or risk to that trouble, and to subject a trustee to losses which he could not foresee, would be a manifest hardship, and would be deterring every one from accepting so necessary an office."

The same rule was followed in *Rowth* v. *Howell*, (3 *Vesey*, 565.) where executors were not held liable for a loss by the insolvency of a banker whom the testator had trusted, and with whom they suffered stock, deposited by the testator, to remain. The principle of this case has a strong bearing upon the point now under consideration. Other cases may be referred to, (*Wilkinson* v. *Stafford*, 1 *Vesey, Jun.* 41. *Vez* v. *Emery*, 5 *Vesey*, 144.) in which the Court of Chancery declared a determination to relieve trustees acting upon professional advice, or with the best judgment they could form, from losses of the trust property.

The case of the assets in hand, which the administrators delivered over to *Fay* to be employed in trade on their joint concern, stands on quite a different footing. Though an administrator may be excused from loss when he leaves an undivided stock of goods in the possession of the surviving partner to be sold, as it is only suffering a business begun by the intestate, to be carried on, according to his intention, to a beneficial conclusion, yet, to put assets, which

*Margin:*

1820.

THOMPSON
v.
BROWN.

Trustees, acting with good faith, are treated with liberality and indulgence. And if there is no wilful misconduct or fraud on the part of an executor or trustee, he will not be held responsible for a loss, especially where he acts with the advice of counsel.

1820.

THOMPSON
v.
BROWN.

are under the trustees separate control, and which have no connection with any previous partnership, into the hands of a merchant in trade, without any security, is exposing the trust fund to unreasonable jeopardy. The policy of law will not permit a trustee to deal in that loose way with the fund. It becomes a distinct appropriation of his own, and not, as in the other case, a mere acquiescence in the act of the intestate, and a continuation of ancestral confidence.

*But if an administrator of a deceased partner, puts assets which are in his hands, and under his control, into the hands of the surviving partner to trade with, without security, he will be answerable for the loss.*

I conclude, then, that in taking the account, in this case, of the assets, the administrators ought not to be charged with the loss sustained on the moiety of the goods left in the possession of *Fay*, and that they ought to be charged with the 665 dollars and 76 cents, put in trade by themselves.

It appears from the answer and the schedules annexed to it, that the defendants are chargeable with assets to 3,428 dollars and 3 cents, and that they have duly administered of the same to 2,465 dollars and 96 cents, which leaves a balance to be accounted for of 962 dollars and 7 cents. And if to this balance we add 491 dollars, for the residue of the goods in store, delivered to them by the sheriff, and 500 dollars for the value of personal property on hand unsold, the balance to be accounted for will be enlarged to 1,953 dollars and 7 cents.

To meet this balance, they will not be entitled to any credit for the 665 dollars and 76 cents, advanced to *Fay* and lost; but they will be entitled to a credit thereon for debts of the copartnership of *B.* and *F.*, assumed by them prior to this suit, and mentioned in their answer, and estimated therein as amounting to 1,583 dollars and 75 cents. If these sums should prove to be correct, they would then have a balance in hand of only 369 dollars and 32 cents, to answer the demand of the plaintiffs, and the bond of *McQuigg* which is mentioned in the answer.

But a difficulty arises as to the proper direction to the master, in respect to the debts. The answer states, that there is a bond creditor, whose debt would greatly exceed the

assets. Shall the master be confined to what is due to the plaintiffs, or shall he also take an account of the bond debt of *McQuigg*, and of the debts of all the other creditors of the intestate? The *English* practice seems now to be to direct the master " to take an account of what was due to the plaintiff, *and to all other the creditors of the testator or intestate*, and that the master cause an *advertisement* to be published in the *London Gazette*, and such other public papers, as he may think proper, *for the creditors to come in* before him and prove their debts ; and that those who should not come in and prove their debts by a peremptory time to be by him fixed, were to be excluded from the benefit of the decree, and that those persons, *not parties to the suit*, who should come in before the master to prove their debts, were, before they should be admitted creditors, to contribute to the plaintiff their proportion of the expense of the suit, to be settled by the master," &c. There are very important consequences growing out of the form of the decree, and which may subsequently affect the rights of other creditors at law, and the whole course of administration of the assets. A creditor has a right to come here for a discovery of assets. This is a settled and necessary right. When here, said Lord *Hardwicke*, (2 *Atk.* 363. 3 *Atk.* 263.) he shall not be turned over to a suit at law, and put to that expense. He shall be decreed satisfaction here for his debt, and this, upon the ground of preventing multiplicity of suits. But then to protect the executor or administrator in making that satisfaction, the decree must be maintained as equal to a judgment at law ; and this leads to much interference with the proceedings of creditors at law, and threatens to draw all the creditors, and the entire distribution of assets, into this court. I have had occasion heretofore (3 *Johns. Ch. Rep.* 58, 59.) to express my apprehensions of this result ; and, therefore, to attain all the information that may be wanting on the subject, I have looked into the history and principles of the English practice.

<div style="float:right">

1820.

THOMPSON
v.
BROWN.

A creditor may come into this Court, against an executor or administrator, for a discovery and distribution of *assets*.

</div>

In *Joseph* v. *Mott*, (*Prec. in Ch.* 79.) a bond creditor brought a bill against an executor to have a discovery and account of the personal estate of the testator, *and a satisfaction of his debt.* There was a decree by default against the executor, for an account and satisfaction out of the assets. Before the decree was made absolute, another bond creditor sued the executor at law. The latter appeared, but suffered judgment, as the decree could not be pleaded at law, and the question before the master was, whether he should allow that judgment which the executor had brought in ; and the Master of the Rolls, afterwards the Lórd Chancellor, held that the decree must be preferred.

This case was decided as early as 1697, by Lord *Somers* ; and as the decree was prior, in point of time, to the judgment, and assuming it to have been entitled to the character of a final decree, the decision was undoubtedly correct, and it is now the undisputed doctrine of the Court.

The next case to be noticed is *Darston* v. *The Earl of Orford,* in 1701. (*Prec. in Ch.* 188. 3 *P. Wms.* 401. *Note F., S. C.*) A bond creditor filed his bill for discovery of assets and to be paid, and pending the suit, after answer, and before decree, the executor voluntarily, and without suit, paid another bond creditor. An account was afterwards decreed, and the question was, whether the executor should be allowed that payment, in the account to be taken. The Lord Keeper held, that the payment was not to be allowed, it being pending a suit here, which was equivalent to an action at law. But this decree was afterwards reversed, on appeal, and the voluntary payment allowed. (*Colles' Cases in Parliament*, 229.) The doctrine then stood, that pending a suit in chancery, *and before decree,* a voluntary payment by the executor to another creditor in equal degree, would be good. This case did not seem necessarily to overthrow the case of *Joseph* v. *Mott,* though Lord Keeper *Wright* thought so, for the point there was, whether a decree prior in time to a *judgment,* should not be

preferred; and Lord *Talbot* cited the case of *Joseph* v. *Mott* as a good authority to that point.

The ultimate decision on appeal in *Darston* v. *Lord Orford*, was not according to sound principle, assuming what is now settled, that Courts of Equity have concurrent jurisdiction with Courts of law in suits against executors, and that a voluntary payment to a creditor, in equal degree, is not good after action brought, though a voluntary confession of *judgment* to another creditor is good, and may be pleaded. In *Waring* v. *Danvers*, in 1775, (1 *P. Wms.* 295.) it was held, that if a bill be filed by a simple contract creditor, against an executor, and the executor thereupon voluntarily confesses *judgment* at law to another simple contract creditor, that judgment creditor would be preferred.

The jurisdiction of Chancery over the distribution of assets, appears by these cases to have been clearly established in the beginning of the last century, and the only difficulty was to reconcile this jurisdiction with the toleration of a race of diligence by creditors at law. But in the course of time, the rights of parties in the respective Courts, and the course of proceeding in Chancery, became gradually better understood and more accurately defined.

In the case of the creditors of *Sir Charles Cox*, in 1734, (3 *P. Wms.* 341.) *Sir Joseph Jekyll*, the Master of the Rolls, thought it to be a clear point, that if a simple contract creditor, *on behalf of himself and the rest of the creditors*, brought a bill and obtained a decree for him and *the rest of the creditors*, to come in before the master and be paid their debts, and that notice be given in the gazette for that purpose, a bond creditor coming in on the foot of that decree should only be paid *pro rata* with the simple contract creditors, for his coming in *implied a submission to the decree*. He was inclined to hold further, that if such bond creditor, *with notice of the decree and of the advertisement*, should lie by and sue the executor at law, the executor and the simple contract creditor would have an equity to compel him to come in

1820.

THOMPSON
v.
BROWN.

and take only his rateable proportion. This was, however, but opinion, and no part of his judgment; and on the decree for an account, (3 *P. Wms. note* 3. *p.* 344.) the master was directed to distinguish between the legal and the equitable assets, and that such as were legal should be applied in a course of administration, and such as were equitable, should be applied *pari passu.*

According to this case, then, a creditor who did not choose to come in under the decree, was not obliged to give up his legal preference, as a specialty creditor, over a simple contract creditor, in respect to his claim upon the legal assets.

In *Robinson* v. *Tonge,* in 1735, (3 *P. Wms.* 398.) a bill was filed by bond creditors against an administrator, and the usual decree was made, that the defendant account, and that the master be at liberty to state any thing specially. In this case, it was insisted, and agreed to by Lord *Talbot,* that the administrator could not pay a bond debt, after a bill in equity brought against him by another bond creditor, and notice, as the bill *was in nature of an action of law,* in which case, the administrator would not be permitted to pay the bond creditor, without giving him a judgment.

This opinion of Lord *Talbot* was unquestionably sound in principle; yet it was directly against the decree on appeal in *Darston* v. *Lord Orford,* and may be considered as reinstating the authority of the decree of the Lord Keeper in that case.

The great case of *Morris* v. *The Bank of England,* in 1736, (*Cases Temp. Talbot.* 218. 4 *Bro. P. C.* 287. S. C.) established, by the highest authority, that decrees in Chancery were equal to judgments at law, and entitled to the same effect in the distribution of assets. In that case, some of the creditors of *Morris* filed a bill against the executrix, praying for payment. She confessed the bill, and the decree was, that an account of the personal assets be taken, and that those debts be paid *in a course of administration.*

The executrix paid part thereof under the decree, and other creditors filed another bill, which was also confessed, and a decree made that the executrix pay what was to be certified by the master to be due, in a course of administration. She was then sued at law by several simple contract creditors, and among others, by the *Bank of England*. All those creditors had notice of the decree, and that the assets were not sufficient to discharge the specialties, and that a considerable part of the moneys due, under the decrees, were unpaid. All the creditors at law, except the bank, took judgment for assets *de futuro*. The bank took issue on the plea of the executrix, and went to trial, and obtained a judgment, subsequent to the other judgments. She then filed her bill against the several creditors by decrees and judgments, stating all the facts, and that she could not, at law, protect herself, under those decrees, from executions on the judgments. *Sir Joseph Jekyll*, the Master of the Rolls, directed *the decree creditors* to be first paid, as being prior in time, and then the *judgment creditors*, according to priority, and then the other creditors to be paid in a course of administration; and the judgment creditors were enjoined from proceeding at law, for so much of the assets as were covered by the decrees. On appeal to Lord Chancellor *Talbot*, he affirmed the decree at the Rolls, and specially directed that the master take an account of what was due to all the creditors, and of the assets received ; that the assets were then to be applied, in the first place, to pay the creditors under the decrees, according to priority, the residue of the assets to be next applied to pay the several judgments according to their respective priorities, and if any thing should remain, then to pay the other creditors *in a course of administration ;* and the defendants who had obtained judgments at law, or who had not yet obtained any judgment or decree, *were enjoined from proceeding at law against the executrix,* and all parties were to be paid their costs out of the testator's personal estate.

1820.

THOMPSON
v
BROWN.

The Chancellor observed, in giving his opinion, that Chancery, in the distribution of legal assets, followed the rule of law, which allowed of preference to creditors who had used. legal diligence; and that that Court had only a concurrent jurisdiction over LEGAL assets with Courts of law; and as such preference was allowed by law, there would be great confusion in the administration of legal assets, if Chancery did not, in general, follow the same rule. If decrees did not stand upon an equal footing with judgments, and to be paid indiscriminately with judgments, according as the one or the other should happen to be prior in time, the Court, as he observed, would have to give up its jurisdiction.

To protect the executor or administrator, in paying a creditor, a decree of this Court is held equivalent to a judgment in a Court of law; and a decree prior in time to a judgment is to be first paid; and judgment creditors may be enjoined from interfering at law with such priority. But creditors will not be restrained from proceeding at law, merely on a bill being filed in this Court, and a judgment obtained before a decree here, will be protected in its priority.

This case then settled the point, that a decree prior in point of time to a judgment was to be first paid; that judgment creditors at law would be injoined from interfering with this priority, and that when they were brought before the Court of Chancery, the distribution would be made *there* with a due preservation of priorities; and that as to other creditors, they were to be paid *in a course of administration*, and which I understand to mean according to legal priorities. The assets were not altered by such a decree, but remained legal assets to be administered according to the rule of law.

This decree, upon appeal to the House of Lords, was affirmed; but it was discussed with very great ability, and especially by the counsel for the appellants, who dwelt upon the inconvenience of allowing a voluntary decree, submitted to by an executor in favour of some creditor, to be a sufficient ground for drawing all the other creditors and the entire distribution of the assets, into equity; that this would expose the creditors to great delay and expense, as the accounts might be taken and the demands adjusted before any payment, and the whole costs of the litigation might fall upon the fund. It was observed, that bills by executors, in the first instance, to have the assets brought

into equity and distributed as equitable assets, had always been rejected.

The case of *Smith* v. *Eyles*, in 1742, (2 *Atk.* 385.) brought the subject before Lord *Hardwicke*, who held, that a decree for an account, *quod computet*, did not alter the nature of the demand ; and that until a *final* decree, an executor might confess a judgment which would have priority, because, until then, it would be impossible to pronounce who would be debtor or creditor; and the same doctrine was lately held by Lord *Eldon*, in *Perry* v. *Phelps*. (10 *Vesey*, 34.) He said that a final decree upon a sum ascertained was equal to a judgment; but that a mere decree for an account of the demand of the creditor and of the assets in the hands of the executor, with a mere direction for payment out of the result of that account, would not prevent the executor from paying a judgment. Until it is ascertained what is due, and a report and an order made thereon to pay, *non transit in rem judicatam.* All the decrees appealed from in *Morris* v. *The Bank of England*, were decrees ordering payment of sums liquidated by statements in the bill, and the admissions of the answer, and were considered in the House of Lords as final decrees.

The *anonymous* case in 3 *Atk.* 572. is too brief and loose to be of much consequence ; but from that case it would appear that any single creditor might file a bill against the executor, without taking notice of other creditors, and the decree would be, that the executor account before a master, and pay, *in the course of administration*, according to the order of legal preference of the debts, to be by him exhibited to the master. But in *Martin* v. *Martin*, in 1748, (1 *Vesey* 211.) Lord *Hardwicke* lays down more precisely the practice of the Court in the analagous case of the heir at law. Actions at law were brought by several bond creditors against the heir, and a bill was also filed against the heir, by other bond creditors, *on behalf of themselves and the other creditors*, to have satisfaction out of the real and per-

1820.

THOMPSON
v.
BROWN.

sonal assets. Here was a race of diligence by different sets of creditors in the different concurrent jurisdictions. A decree was obtained in Chancery directing an account of the debts, and a sale of the real assets descended, to satisfy those demands. The heir then filed his bill to restrain those bond creditors who sued at law, because by the decree for a sale, the fund was taken from him. The Lord Chancellor granted the injunction, and held that the heir or executor, in a like case, had no relief but by injunction, to support the decree and prevent a double charge, for though the decree was prior in time, it could not be pleaded at law. The decree or judgement first obtained must be first paid, and if the decree be prior, it could only be established by injunction. But he observed, that *until a decree*, a proceeding by different creditors in different suits, in law and equity, cannot be stopped, or the chance of gaining priority prevented. The constant course of the Court, on a decree for sale in satisfaction of a bond creditor, not only in the case where it was on behalf of himself and others, but even where the bill was *for satisfaction of his own particular debt*, was to direct an account *of all the bond debts of the ancestor, with liberty to the creditors to come in for a satisfaction.* He said, no decree could be made without this liberty, for all the creditors were entitled to receive satisfaction, and might otherwise sue at law and proceed against the estate; which, after the decree for a sale, would be mischievous.

A suit by one creditor against an *heir*, and a decree for the sale of the assets descended, will enure for the benefit of all the creditors, and draw the entire distribution of them, into this Court.

This case then settles the rule, that in a suit against the heir, and decree for a sale, it enures for the benefit of all the creditors, against the heir, and draws the entire distribution of the assets of the heir into this Court.

The case of *Douglass* v. *Clay*, in 1767, (cited in 1 *Bro.* 184. and 10 *Vesey*, 40.) was decided by Lord *Camden*, upon the administration of personal assets; he held, that until a decree, any creditor might proceed at law, but after the decree, the Court considered it as much available to any

creditor, and as to all who came in, as if all had obtained judgment. A decree, therefore, at the suit of creditors against an executor, for an account, binds all other creditors, and if they afterwards sue at law, the Court will enjoin them. Lord *Thurlow*, afterwards, in *Brooks* v. *Reynolds*, in 1782, (1 *Bro.* 183.) declared the same rule. That was a bill by trustees against the heir, executor, and legatees; and the decree directed proper accounts to be taken, and the personal estate, not specifically bequeathed, to be applied to pay debts and legacies; and if not sufficient, any creditor was at liberty to apply to the Court. Here was no special order for creditors to come in. Proceedings were had under the decree, but there was no report; and in the mean time there was a suit at law by a creditor. The executor filed a bill to stay that suit, and the Chancellor held that it made no difference though creditors were not ordered to come in, nor the bill filed on behalf of creditors, for they might come in before the Master, and as the Court had taken the fund into its own hands, it would not permit the executor to be sued at law.

These two cases would seem to settle the rule in the case of personal assets, as much as that before Lord *Hardwicke* did, in the case of the heir; and they consider a decree against an executor, as enuring equally for the benefit of all the creditors, and as drawing the whole administration of the personal assets into this Court.

The case of *Goate* v. *Fryer*, in 1789, (2 *Cox*, 201.) is much to the same purpose. A creditor filed a bill on behalf of himself and all the other creditors who should come in and contribute, for an account of the personal estate of the intestate, and a distribution rateably among all the creditors. The administrator submitted to account, and a decree was made for taking an account, advertising the creditors, and for a *rateable distribution*. The administrator was sued at law before filing the bill, and after pleading, and immediately after the decree, filed a bill for an injunction,

1820.

THOMPSON
v.
BROWN.

And it is the same in suits against executors and administrators.

Lord *Thurlow* said, it was now the settled rule of the Court, not to permit any creditor to proceed at law against an executor or administrator, *after a decree to account, and for payment of all debts*, for that gives every creditor who comes in, a claim equal to that of a creditor by judgment at law, from the date of the decree. The Court only supports a decree as equal in point of rank to a judgment, and then follows the rule of law giving preference to the judgment or decree, prior in time. Such a decree was considered as taking the administration of the whole personal estate into the hands of the Court, and that all subsequent proceedings at law were to be stayed. The injunction was granted, but as the suit at law was first commenced, the creditor was allowed to prove his costs also under the decree.

The following case of *Hardcastle* v. *Chettle*, in 1792, (4 *Bro*. 163.) was founded upon the same doctrine, and related to the question of staying suits at law. It was the case of a bill by a creditor on behalf of himself and other creditors, against an administrator, for an account, &c. The usual decree was rendered for taking an account, and for creditors to come in before the Master, and the usual notice was inserted in the gazette. A creditor came in before the Master, but did not establish his debt, and afterwards sued at law and obtained a verdict. A motion was made for an injunction to stay the entry of judgment. The Lords Commissioners granted the motion, and held, that as the creditor had appeared before the Master to prove his debt, he had so far become a party to the suit, as to warrant the motion, *without filing a new bill*.

In *Rush* v. *Higgs*, in 1799, (4 *Vesey*, 638.) an executor who had been sued at law, and in which suit issue had been joined, filed his bill to stay that suit at law, and prayed for the direction of the Court as to his administration. His counsel endeavoured to support the injunction, contrary to the received doctrine, that it was previously necessary that there should be a decree for an account at the instance of a

creditor, and that the executor cannot come in voluntarily and file a bill against all the creditors. But Lord *Loughborough* said, that there was no instance in which a creditor at law had been stopped, *unless there was a decree under which he could come in ;* and he said further, that the executor could not file a bill against all the creditors. This would be to cast off at once upon the Court, the whole burden of his administration.

The subject was brought into discussion before Lord *Eldon*, in *Paxton* v. *Douglass*, in 1803. (8 *Vesey*, 520.) Here was a decree for an account against an administrator, and a motion was then made on his part, for an injunction, to restrain a creditor at law, and it was considered, on that side, as a motion almost of course. The objection was, that there ought to have been a bill filed against the creditor, to sustain the motion. Lord *Eldon* said, that it was well settled, that a decree for administration of assets, was a decree, in nature of a judgment *for all creditors ;* and that since Lord *Hardwicke's* time, the Court had been in the habit of enjoining *any creditor*, for that purpose. The recent practice introduced by Lord *Rosslyn*, had been to grant the injunction *without a new bill*, on the convenient ground, that the creditor might come in before the Master upon the foot of the decree, without a bill, as the decree was for him; and it seemed reasonable, in order to save expense, that the executor, when sued, giving notice to the creditor, should be able to bring him in. The decree was in the nature of a judgment for all creditors, and as it cannot be pleaded at law, the jurisdiction must be given up, if it did not stop all proceedings, and all further costs at law, *after notice of the decree*, to be given by the party seeking to restrain the creditor.

The Lord Chancellor refused to grant the injunction, without an affidavit of the executor, as to the assets on hand; and the practice was adopted to prevent the abuse of bills

being filed by a friendly' creditor, in collusion with the ex=
ecutor, and a decree from being " snapped," as Lord *El-
don* expressed it, by a solicitor who was concerned for all
parties, and an injunction procured, and then no money
was to be found with the executor, while the creditor at law
had thus lost the opportunity to fix him.

Lord *Redesdale* had occasion to declare the course of
the *English* practice, and the rules of equity on this subject,
in the case of *Largen* v. *Bowen.*   (1 *Sch. & Lef.* 296.)   He
said, that if a creditor at law can obtain judgment before a
decree, he will have obtained, and will be protected in his
priority ; and that Chancery would not restrain creditors at
law against executors, merely on a *bill filed* by other cre-
ditors.   But when a decree is obtained, the Court proceeds
on the ground, that *the decree is a judgment in favour of all
the creditors*, and that all ought to be paid according to their
priorities as they then stand ; and the Court could not exe-
cute its own decree, if it permitted Courts of law to alter
the course of payment.

The practice in *Paxton* v. *Douglass*, was afterwards re-
cognized in *Gilpin* v. *Lady Southampton.*   (18 *Vesey*, 469.)
It was the case of a bill by a creditor against an administra-
tor.   The usual decree was obtained, and on a motion for an
injunction, Lord *Eldon* said, that where the answer did
not state what the assets were, the executor must state them
by affidavit, before an injunction would be granted, to re-
strain a creditor from proceeding at law.   He observed,
that these suits were generally by the executor, in the name
of a creditor; the object was to *give a judgment to all
the creditors*, and to secure a distribution of the assets, *with-
out preference* to any, and that where once a decree was
made, it was impossible to permit a creditor to go on
at law.   To close this part of the inquiry, I shall only
refer to the case of *Dyer* v. *Kearsley*, in 1816.   (2 *Meri-
vale*, 482. note.)   The motion there, was by the plaintiff,

the creditor who had obtained the usual decree, and then an action at law by another creditor, and a judgment by default. The motion was to restrain execution at law, and it was granted upon the usual affidavit of the executor, as to the state of the funds, and with a declaration that the plaintiff at law was entitled to his costs up to the time when he had notice of the decree, to be paid out of the assets.

. We now perceive, that the observation of Sir *James Mansfield*, in 1 *Campb. N. P.* 148., was founded on the best authority, when he said, that the creditors of a deceased insolvent might always be compelled, through the medium of a Court of equity, to take an equal distribution of assets, without preference to any ; and that it was only necessary for a friendly bill to be filed against the executor or administrator, to account, after which (that is, after the decree,) the Chancellor would enjoin any of the creditors from proceeding at law.

The doctrine, then, as finally settled in the *English* Chancery, is, that upon the usual decree to account, in a suit by one or more creditors against the executor, either singly for themselves, or specially on behalf of themselves and all other creditors, (for it makes no difference,) the decree is for the benefit of all the creditors, and in the nature of a judgment for all ; and all are entitled, and are to have notice to come in and prove their debts before the Master ; and that from the date of such decree, an injunction will be granted, upon a due disclosure of assets, upon the motion of either party, to stay all proceedings of any of the creditors at law. The establishment of this doctrine, and practice, is to be traced back to the decisions of Lord *Hardwicke*, Lord *Camden*, and Lord *Thurlow*, though the practice of staying proceedings, on motion, without a new bill, and of requiring a disclosure of assets to prevent abuse, is of more recent date. The usual decree for an account, or *quod computet*, is sufficient to warrant the interference with proceedings at law ; and it is not necessary, as Lord *Thur-*

1820.

THOMPSON
v.
BROWN.

The decree, whether in a suit by a single creditor for himself, or for himself and all the creditors, being deemed for the benefit of all, is in the nature of a judgment for all ; and all the creditors are entitled, and should have notice to come in and prove their debt before the Master ; and from the date of the decree, and on due disclosure of assets, an injunction will be granted, on motion of either party, to stay all proceedings of creditors, at law.

*low* observed, in *Kenyon* v. *Worthington,* (cited in 10 *Vesey,* 40.) that the decree should be final, though, as we have seen, it is the *final* decree only upon a sum ascertained, that is equal to a judgment, and entitled to a preference in payment, if prior in time.

It would rather appear, that the doctrine of Lord *Hardwicke* and his successors, was only a necessary consequence of the principles long before recognized, that Chancery had concurrent jurisdiction in the case, and that final decrees were to be protected as equal to judgments. The latter practice became indispensable to support the acknowledged jurisdiction, inasmuch as the executor could not plead the decree in bar of a suit at law, and he would, therefore, have been exposed to a double charge. We have seen, that that great man and able lawyer, Sir *Joseph Jekyll,* near a century ago, perceived the necessity, and expressed a strong opinion in favour of the rules and course of proceeding which prevail at this day. The only material variation between the former and the latter doctrine, is in respect to the distribution of the assets. Formerly, the decree seemed to be considered, judging from the more loose language of the cases, as a lien in favour only of the particular creditor who filed the bill ; and creditors who were not parties to the suit, and were not judgment creditors, were to be paid out of the residue of the assets, in the course of administration, which would give specialty creditors a preference over simple contract creditors. But now, according to opinions to be deduced, as I apprehend, from the time of Lord *Camden,* they would all be paid rateably, after the judgment creditors were satisfied ; and this not only on the general rule of equality, when equity distributes the fund, but also on the ground, that the usual decree to account, and allowing all the creditors to come in, rendered the decree in the nature of *a judgment in favour of all.*

Upon the whole, I consider myself bound by those doc-

trines and rules which are to be deduced from this review of
the cases, and which have been the settled law of the *Eng-
lish* Chancery, for perhaps half a century. There has been
no alteration in doctrine since, and only some improvements
in the practice. The law of the Court, as it is now under-
stood, seems to rest upon the clearest principles of justice,
and it is not destitute of strong support in public conve-
nience and commercial policy.

But to return to the further examination of the case be-
fore me : another object of the bill is to have the real estate,
descended to the infant heirs of *Brown,* sold for the pay-
ment of the plaintiff's debt.

The administrators deny that they have interfered with
the rents and profits of the real estate ; and the defendant,
*Elizabeth Brown,* admits, that she, under her claim of dow-
er, and as mother of the children, has received the rents
and profits, and expended them in the necessary mainte-
nance of the infants. I am not disposed to call the mother
to account for rents and profits so received and expended.
There was a good deal of doubt expressed in the old cases,
(*March* v. *Bennett,* 1 *Vern.* 428. *Waters* v. *Ebrall,* 2 *Vern.*
606. *Chaplin* v. *Chaplin,* 3 *P. Wms.* 365.) as to the duty
of the guardian to apply the rents and profits of the real
estate to pay the bond creditors of the ancestor. The
guardian certainly ought not to be answerable for rents and
profits applied for the support of the infants, prior to any
due notice or application from the creditor. But the case
of *Martin* v. *Martin,* already cited, shows, that the credit-
ors may, by bill, obtain a decree for an account of the
debts chargeable upon the real assets descended, and for the
sale of them to satisfy the debts. In *Lowthian* v. *Has-
sel,* (4 *Bro.* 167.) a bill was filed by creditors against the
devisee, for sale and distribution of the real estate. The
decree in that case was, that the Master take an account of
the rents and profits of the real estate, and the estate was

*The widow and administratrix, who, under her claim of dower, and as guardian to her children, had received the rents and profits of the real estate, and expended them in the necessary maintenance of her children, was not held to account to a creditor, on bill filed against her and the heirs for an account, and for the sale of the assets descended.*

*1820.*

**THOMPSON**
***v.***
**BROWN.**

Creditors may file a bill against heirs and devisees, for sale and distribution of the real estate, in case the personal estate proves deficient. And it is no objection to such sale that the heirs are infants.

ordered to be sold, and the moneys arising from the sale, and on the account of the rents and profits, to be applied to make good the deficiency of the personal estate. In the present case, it would seem to be premature to take any order for the sale of the real estate, until the amount of the debts, and the deficiency of the personal estate, are first ascertained. I shall, therefore, make what, under the cases which have been examined, may be called the usual decree, to take an account of the debts and personal assets, and for rateable distribution, subject to preference of judgment creditors; and I shall include in it a direction to state the amount of the real estate, and of the incumbrances thereon, and reserve all further directions as to the real estate. The right of application to stay proceedings at law, either in respect to the personal or real estate, will, of course, be left open.

I have not considered it as any objection to a sale of the real estate, that the heirs are infants. In *Pope* v. *Gwyn,* (8 *Vesey,* 28. note,) the heir was an infant at the time of filing the bill, and at the decree, directing a sale of the real estate to pay creditors of the testator; and the infant defendants in that case, who were co-heiresses at law, were ordered to convey, on coming of age, unless they should show cause to the contrary. The form of the decree is given in the note of that case; and it must have been considered, as it was a point in the case, that the parol should not demur, and so it was determined in *Hargrave* v. *Tyndal.* (1 *Bro.* 136. note.) The statute for *the relief of creditors against heirs and devisees,* makes provision, that in suits at law against the infant heir or devisee, the remedy shall not be suspended by reason of nonage; and the equity of that provision applies to this Court.

Decree.

The following decree was entered :

" ORDERED, that it be referred to one of the Masters, &c.

to take and state an account of what may be due to the plaintiffs upon their demand, stated in the bill, and to all other the creditors of the intestate from him, at the time of his death, either in his individual character, or as a partner of the house of *B. & F.*, in the pleadings mentioned ; and whether by judgment, mortgage, or otherwise ; and the Master is to cause reasonable notice to be given, in his discretion, either personally, or inserted in such public paper or papers as he may deem proper, for the said creditors to come in before him and prove their debts; and he shall fix a peremptory day for that purpose, and such of them who shall not come in and prove their debts by the time so to be limited, shall be excluded from the benefit of this decree;. and such persons, not parties to this suit, who shall come in before the said Master to prove their debts, are, before they be admitted creditors, to contribute to the plaintiffs their proportion of the expenses of this suit, to be settled by the said Master. And *it is further ordered*, that the Master take an account of the personal estate of the intestate, which hath come to the hands of the defendants, (administrators,) or to the hands of any other person, by their order, or for their use. And *it is hereby ordered*, by way of special directions to the said Master, that in taking such account, the administrators be not charged with any loss sustained by the act of the defendant *F.*, on the undivided moiety belonging to the intestate, of the goods, chattels, and credits of the said firm of *B. & F.*, in possession of *F.*, by the administrators, and which undivided moiety is stated in their answer, to have been of the value of 3,601 dollars and 45 cents. *And it is further ordered*, that the administrators be charged with the amount, without interest, of assets, being in money and stock, or chattels, and amounting to 665 dollars and 76 cents, and put into the possession of *F.* by them, as part of the partnership stock between them ; and that they likewise be charged with the amount in value of goods received by

them upon the insolvency of *F.* from the said partnership stock, and stated by them to be of the value of 491 dollars; and that they likewise be charged with the amount in value of assets admitted to be in hand unsold, and stated by them to be of the value of 500 dollars; and that they be charged with moneys received from the debts of the continued partnership formed between them and the said *F.*, and stated by them to amount to 268 dollars. *And it is further ordered,* that they be credited with the debts of the partnership of *B. & F.*, for which they have made themselves personally liable, as and for so much money paid by them in a course of administration, and which said debts, with the interest and costs thereon, are estimated by them to amount to 1,583 dollars and 75 cents. *And it is further ordered,* in addition to these special directions, that the administrators be charged with all other assets which may have come to their hands, or to the hands of any other person for their use, and be credited with all other payments and dispositions thereof, by them made in a due course of administration. *And it is further ordered,* that the said Master make all just allowances to the said administrators for costs and expenses, but that no allowance be made, under the special circumstances of this case, by way of compensation for their time and trouble. *And it is further ordered,* that the said Master also state an account of the location, quantity, and value of the real estate of the intestate, whereof he died seized, and of the amount of the incumbrances thereon; that the Master report in the premises with all convenient speed, and that he report specially on any point, or apply for further directions, if he should deem it proper. *And it is further ordered and declared,* that the balance of the said personal estate that shall, upon such accounting, be found to be remaining in the hands of the administrators unadministered, be applied, in the first place, to pay and satisfy judgment debts against the said estate, according to their respective priorities in point of time; and if any assets shall then remain

unadministered, that the same be applied to pay the plaintiffs, and all other creditors, if any, who shall have come in under this decree, and proved their debts before the said master; and if not sufficient to pay all of them, including their costs, then in rateable proportions, according to their respective amounts, and without any preferences, or regard to legal priorities. *And it is further ordered,* that if any proportion of the debts, and the costs and charges thereon, shall still remain unsatisfied, the plaintiffs, or any other of the creditors who shall have so come in under this decree, shall be at liberty to apply to this Court, on the foot of this decree, for a sale of the real estate of the intestate; and that the proceeds arising from such sale, be applied to satisfy the proportions of debts that shall remain due, but that all legal incumbrances upon such real estate shall have preference. *And it is further declared,* that the right of application on the part of either of the parties to this suit, for an injunction, if requisite, to stay proceedings on the part of any creditor at law, either in respect to the personal or real estate, or to stay proceedings on any mortgage upon the said real estate, is left open. And all other and further directions and questions are reserved."