Brockenbrough, J.
The main question to be decided in this case, was not fully discussed at the bar, *201 which I very much regret, as such discussion would have thrown much additional light on the subject. That question is, whether, in a bill for marshalling assets, the court of equity is required, by well established rules, in all cases to direct a sale of the real estate descended to the heir, for the purpose of paying the debt of the simple contract creditor, or whether it has not a discretion to direct the debt to be made from the rents and profits of the land, where, by the application of such rents and profits, the debt may be discharged in a reasonable time ? and whether, if such discretion exists in the court, an improvident exercise of it, may not be corrected by the appellate court?
In Blow v. Maynard, 2 Leigh 57, 8. judge Green, in stating the question, whether in a proceeding in equity against the heir and a fraudulent donee of the debtor, on a judgment against him in his lifetime, or on his bond binding his heirs, the lands can be sold, shews that lord Hardwiclce had decreed a sale of the moiety only of the land, on the ground that a moiety only was bound by the judgment at law; that lord Redesdale had, in Ireland, established the same doctrine of the right to sell; that it had been established in England, as far back at least as the year 1730; and then makes this further remark: “ This principle, so far as I am informed, has been uniformly practised on in the courts of Virginia, in the cases of heirs bound by the obligations of their ancestors. And although I cannot see clearly the foundation of this equity to sell, when the law only authorizes an extent on a personal judgment or decree against the heir, for the value of the assets descended, whether alienated by him or not, yet I think we are bound by the practice founded on these precedents so long acquiesced in.” Judge Cabell, (Id. 66.) remarking on the same decisions said—“The decrees for the sale of the moiety of the land, in such cases, proceed on the principle, that the creditor has, by his judgment, a, lien on *202 the moiety of the land for the payment of his debt out of the rents and profits; and the courts of equity, on the ground of rendering the remedy more effectual, accelerate the payment, by directing a sale, instead of ieVying the debt out of the rents and profits. The principle, which justifies a sale of the moiety of the land in the ca'ses” decided by HardwicJee and Redesdale, “ applies in .all its force to the case before the court, and extends to the sale of the whole land. Blow by his decree acquired a lien on the whole land, and, consequently, has the same equity to demand a sale of the whole, that the plaintiffs in Stileman v. Ashdown, had to demand a sale of the moiety.”
The authority of the court of equity to decree a sale being thus affirmed, and the. ground taken for such decree being that the remedy of the creditor was rendered more effectual by accelerating the payment, it may, perhaps, be proper to inquire, what is the remedy at law, which a specialty or judgment creditor has against the heir, as to satisfaction out of lands descended to him from the ancestor. If a judgment be rendered against the ancestor, or a recognizance not binding heirs be acknowledged by him, which is in nature of a judgment, a scire facias may be brought against the heir, but the plaintiff cannot have execution against the heir, of any more than a moiety of the lands which were his ancestor’s at the time of the judgment or recognizance, or after. For the heir is only chargeable as tenant of the lands, and not as heir, and debt does not lie against him, but only a scire facias to have execution of the ancestor’s lands in his hands. And no execution at common law to seize the land, could be issued against the tenant, for the levari facias only issued, says Coke, “ against the corn, and the like present profit, which shall grow upon the land,” and the land itself was not delivered by it; but the statute of West. 2. ch. 18. entitled the plaintiff or conusee to sue out an elegit,
*203 by which a moiety of the lands was delivered by the sheriff; and therefore, the execution against the heir, who is only liable as tenant, must also be for the moiety only. Another reason given is, that in a judgment against, or recognizance by, the ancestor, the heir is not named. But if an action of debt be brought against the heir on the obligation of his ancestor binding heirs, the heir is not charged, as tenant of the lands, but as a debtor in the dcbet and detinet; and in case judgment is given against him, the whole of the land descended, of which he was seized at the time of suing the original writ, may be delivered to the plaintiff in execution; and this by the common law, although the plaintiff was not by the same law entitled to have any part of the land in execution against the ancestor himself. And the reason why the whole lands are delivered, is, that as the common law allows an action of debt against the heir on the bond of his ancestor, and as the executor is entitled to the whole of the personal estate, the plaintiff will derive no fruit from his action unless he can take the real estate in execution. Herbert's case, 3 Co. 11b- 2 Wms. Saund. 7. n. 4. Although in the one case, one moiety, and in the other, the whole of the land was delivered to the plaintiff| yet, in neither case could the land be sold, under the execution. The writ of elegit given by the statute speaks for itself. It commands the sheriff to cause to be delivered to the plaintiff all the goods and chattels of the defendant, saving his oxen and beasts of the plough, and also a moiety of all his lands and tenements whereof he was seized &c. by reasonable price and extent, to have and to hold the said goods as his own, and the said moiety as his freehold See. until he shall have levied thereof the debt and damages. The return of the sheriff shews, that he proceeds by inquisition, and that the jury decides on the price of the goods, and. the annual value of the moiety of the land delivered to him. In the other case, the writ
*204 of extendi facias is perhaps as clear, though not so familiar as the elegit. Plowden, in Davy v. Pepys, p. 439. gives not onty tbe ju(lgment;> but the form of proceeding, in debt against the heir upon the obligation of his ancest0]^ the defendant confesses the debt, and shews the certainty of assets. The judgment directs the debt to be levied of the land set forth in the plea, and commands the sheriff to make inquisition of the annual value thereof, and to deliver the same until he shall have levied the debt and damages thereof, and the execution issues according to the judgment. See 3 Tuck. Blacks. Comm. 421. n. 27. Tidd, in his practical forms, ch. 42. pp. 422, 3. (Ed. of 1828) gives several forms of this writ of extent against an heir, where he does not in his plea set forth the certainty of assets. They all direct an inquest to be taken by the sheriff, of what lands the ancestor died seized, which descended to the heir, and the annual value of those lands, and commands the sheriff to deliver them to the plaintiff to be held by him as his fr 1 'M, until the debt and damages shall be thereof fully levied.
Although the courts of law do not, in any such case, authorize the sale of the lands of an heir, yet it must be admitted that the courts of equity have, for a long period, exercised the power of selling them. Whilst they professed to adopt the rule that equity follows the law, they seem, in this instance, to have outstripped it. They seem to me to have assumed a power which the legislature itself, very sparingly, and in particular cases only, thought proper to authorize. It is probable, that in many instances, they thought it would better subserve the purposes of justice, to sell the estate, and pay off the debt at once, than to wait for the tedious process of discharging it by annual contributions. It was better for the creditor, and might not be injurious to the heir. If the debt was so large, and the profits of the land so small, that the interest could not be kept down by those *205 annual profits, there was no reason why it should not be sold. The delivery of the land, in such cases, to the creditor, to be held by him till he should levy the debt from the profits, would be as complete an alienation of the land from the heir, as if it were sold. And if it would require a long tract of time to pay off the debt, although it did not square with the rules of Law, yet it might be more consistent with equity to make a sale. The heir too, might frequently prefer it, and as he was always an adult (for in the case of an infant heir, the parol demurred till he came of age), he was always able to give his assent to such a decree. Whether such were the reasons which influenced the courts of equity or not, I cannot say; but it cannot now be questioned, and the cases certainly prove, that, in bills brought against heirs, and fraudulent donees, to set aside conveyances of the ancestor, and in bills for marshal-ling assets, the courts of equity have exercised the power of selling lands which have come to the heir by descent. And although this may have been originally an usurpation of power, it is perhaps proper to adhere to it, in cases winch are of a character to justify it.
But still the question recurs, is it imperative on the courts of equity to decree a sale ? Have they no discretion to refuse a sale, in a case where in a few years the whole debt may be discharged by the application of the profits to its extinguishment ? Is there any case reported in which a refusal under such circumstances occurred ? Unless some cogent authority can be produced proving the absence of such a reasonable discretion, I a.m of opinion, that it ought to be exercised; and I am the more satisfied of the propriety of exercising it, because we should thereby pay some regard to the spirit of the decisions of the common law courts. In Stileman v. Ashdown, 2 Atk. 607. lord Hardwicke wou Id not allow a judgment creditor to have a sale of the whole land, although he would be placed in a worse *206 condition than a bond creditor; he paid a respect to the legal rights of' the parties, and gave the creditor only a moiety. And in O'Gorman v. Comyn, 2 Sch. & Lef. 139. the chancellor said, “ Although this court has been *n tpe papp. 0£ geppjg i0 pay judgment debts, where it was ascertained that they were legal liens on the land, the foundation of that was the legal right. The only equity the creditor had, was to render his remedy more effectual, by getting a sale instead of levying his debt out of rents and profits, which was the only execution the common law gave and he accordingly ordered a sale of the moiety. If this be the only ground of directing a sale, why decree a sale, when the payment of the debt will be sufficiently accelerated by the application of the rents and profits to its extinguishment ? In the case before us, it appears, that very few years would have been sufficient for the purpose, and I am therefore of opinion, that the land should not have been sold.
In Virginia, great injury may be done to infant heirs, if it be established as a principle, that their lands must necessarily be sold, where the personal fund has been exhausted, and a bill is exhibited to marshal the assets. As the parol does not demur, and in court infants have frequently no person to protect their interests but a guardian ad litem, who habitually makes amere nominal defence, what is there to prevent a sacrifice of their inheritances, if the courts of equity divest themselves of all discretion as to the best mode of directing a disposition of their lands ?
I am also of opinion, that there was error in this decree, in not giving the infants a day after they should arrive of age to shew cause against it. There was error also, in confirming the marshal’s sale of the land, when it is clear, that he departed from the terms of the interlocutory decree directing a sale. It was not proper that the marshal should undertake to decide what mode of selling, variant from the terms of the decree, would best *207 subserve the interest of either or of both of the parties. If he had good reasons for thinking, that the sale under the terms of the decree would be injurious to the infants, he should rather have made a special report to the chancellor, that he might judge of the course proper to be pursued.
I am also inclined to the opinion, that if a sale was proper in this ca.se, it should have been on a credit, instead of for cash, according to the discretion vested by our statute in the courts, in such case.
Carr, J.
I think the decree erroneous in several points.
The Pattons sue as assignees of their father: the answers call for proof of such assignment, and there is none in the record. It was said in the argument, that this was a general assignment; that under it, many suits were brought,—several in the same court; and that in some one of these the assignment was filed. I feel no doubt of the fact. Yet this will not excuse the failure to file the proof when expressly called for. If it could be considered a part of the record, a certiorari might bring it up. But, I presume, we could hardly get it, in that way. As the assignor is no party to the suit, a decree would not protect the defendants in paying.
No time is given to the infants to shew cause against the decree when of age. It was said, that this was not necessary, because being sued and decreed against as infants, they have a day whether given by the decree or not. But there are various authorities against this proposition, which shew that the rule is general, that the interest of infants is so far regarded and taken care of, in the court of chancery, that no decree shall be made against an infant, without giving him a day to shew cause against it, after he comes of age. Cary v. Bertie, 2 Vern. 342. Richmond v. Tayleur, 1 P. Wms. 736. Again; if there are several, parties to a suit in *208 chancery, and it appears, that one of the defendants is an infant, and any thing is prayed against him, by the decree, he must have a day given him, to shew cause. The words of the decree are thus—“And this decree is to be binding on the said J. S. (the infant) unless he shall within the time of six months after he shall attain his age of twenty-one years (being served with process for that purpose) shew unto this court, good cause to the contrary.” The process is by way of subpoena, to be served on the defendant on his coming of age. If he shews no cause, the decree is made absolute upon him. But if he comes forward to shew cause, he may put in a new answer and make a new defence. Bingham on Infancy, 131, 2. and the cases there collected. It is clear from the authorities, that to decree against an infant without giving him a day, is error; and for such error he may seek redress against the decree, without waiting till he comes of age; and he may do this either by bill of review, rehearing, or by original bill, alleging specially the error of the former decree. But it was contended, that this decree not being final, the omission to give day may be supplied by the court below, and does not furnish ground for reversal; and the case of Pickett & ux. v. Chilton, 5 Munf. 467. was cited, where it is decided that the failure to give day to infants, is not such error as will reverse an interlocutory decree, because it may be supplied at the final hearing. In Harvey v. Branson, 1 Leigh 108. this court decided, that every decree which leaves nothing more to be done in the cause, no subject to be acted upon or disposed of, no question to be decided by the court, is in its nature final. And such (1 think) is the character of the decree in the case before us. The debts of the creditors were fixed by the report of the commissioner, which was confirmed : the order of court directed the marshal to sell the land: he reported, that he had sold 300 acres, and paid all the creditors, with all charges, costs &c. This *209 report was confirmed, and the surveyour is ordered to lay off the 300 acres, and report his proceedings in order to a final decree; he returned a survey; upon which the cause came on to be heard, and the court approving the survey, directed the marshal to convey the land to the purchaser. Nothing more was ordered; no further day given to the parties. This seems to me to have all the attributes of a final decree.
It was also objected, that the decree was taken against the absent defendant, without giving him time to shew cause against the decree, or recpiiring the bond of the plaintiffs, directed to be given in such cases. I incline to think this may be considered as cured by the subsequent appearance of the absent defendant before the marshal, and his joining in a written instruction to that officer, in what manner to sell the land.
But another objection has occurred, one which goes to the foundation of the decree. This is a bill filed by simple contract creditors, seeking to marshal the assets of a deceased debtor. It is brought against the administratrix and infant heirs, and prays that the land may be sold to satisfy their debts, to the amount of the personal assets, which have been exhausted in discharging obligations which bound the heirs. Upon hearing, the court made the usual order, directing an account of the administration; what specialty debts of the intestate had been paid, what lands had descended, and the value of the yearly rents and profits thereof; and also, that the commissioner should take proof of all the debts due from the intestate, to such creditors as might appear before him, and agree to contribute to the costs and expenses of the suit &c. And finally (as 1 have stated) a part of the land was sold, and a deed directed to be made for it. The power of the court to decree this sale is questioned, especially in the case of infants, and where from the report, the rents and profits would, in a few years, pay the debts.
*210 In Blow v. Maynard, 2 Leigh 29. 57. judge Green says—“ The real question is not here, whether a court of equity, setting aside a fraudulent deed, in favour of a judgment creditor, in the lifetime of the debtor, can sell the land, but whether, in such case, in a proceeding in equity against the heir and fraudulent donee of the debtor, upon a judgment against him in his lifetime, or on his bond binding his heirs, the lands can be sold?” After citing english cases, shewing that the question has been settled affirmatively there, since 1730, he adds— In Blow vjudgment or decree against the heir, for the value of the assets descended, yet I think we are bound by the practice founded on these precedents so long acquiesced in.” I certainly shall not pretend to have discovered the foundation of this equity to sell, which has escaped the researches of that learned and able judge: yet I may be permitted to suggest, that courts of equity, in adopting the practice, were, perhaps, somewhat influenced by the considerations, that when a man binds himself and his heirs, the heir, to the amount of the assets descended, is as much a debtor, as the ancestor; “ that when he does not deny assets, but pleads other matter which implies that he has assets, or denies assets, and it is found against him, the debt of his ancestor is become his own debt, in respect of the assets which he has in his own right, and so the property of the land, which he has in his own right, makes the debt to be his own proper debt.” Davy v. Pepys, Plowd. 440. These are the doctrines of the common law. And moreover, we see from the same case in Plowden, and others, that when the heir sets out in certainty the assets descended, and judgment is given upon that “ This principle, so far as I am informed, has been uniformly practised in Virginia, in the cases of heirs bound by the obligations of their ancestors. And although I cannot see clearly the foundation of this equity to sell, when the law only authorizes an extent on a personal *211 plea, an execution issues by which the whole land is J delivered to the plaintiff, till his debt is paid. Seeing, then, that by reason of the bond, and the land de'scended, the heir was bound to the full gross value of the land, courts of equity might conclude,'that it was most just and convenient, to soil, at once, the subject in respect of which and to the value of which the heir was bound, and discharge the debt. However this may be, and though we may not be able to see clearly at this day, the foundation on which the power to sell rests, I entirely concur with judge Green, that we are bound by the practice, if we shall find it as long established, and as uniformly followed, as ho supposed it.
Lot us look to some authorities on this point. The inquiry immediately before us, is, as to the practice of selling land, to pay simple contract creditors, where the personal assets have been exhausted in paying bond debts binding the heir. Before I go into the cases of marshalling, however, I will cite a few where equity has decreed a sale of land, to satisfy the bond creditors themselves. In Manaton v. Manaton, 2 P. Wms. 234. (decided in 1724,) one seized of land in fee, and being indebted to several in bonds binding the heirs, devised his lands to A. for life; then to trustees during the life of A. to preserve contingent remainders; then in strict settlement: the bond creditors filed a bill for recovery of their debts: lord Macclesfield at first doubted, whether there could be a sale of the land decreed, there being no devise of it for payment of debts; and he took time to consider of it. At another day, “ they who prayed a sale, insisted that the court had often decreed, a sale against the heir, lor the payment of bond debts ; for that the land descended was assets, and as such ought to be sold; and that it had been so decreed in the cases of Trevor and Trevor, and Meller v. Edisbury.” The chancellor finally decreed the sale of the lands in a certain order, for the payment of the bond debts. *212 Stileman v. Ashdown, 2 Atk. 608. is another case in which lord Hardvñcke decreed the sale of land against the heir to pay a judgment creditor: he directed the sale of but half the land, to be sure; but this was because he congj¿ere¿ that the judgment against the ancestor, bound but half in the hands of the heir: for as much as was bound, he gave the remedy by sale, instead of extent; and this without any inquiry how soon the rents and profits would pay. The cases of Galton v. Hancock, 2 Atk. 430. and Donne v. Lewis, 2 Bro. C. C. 257. turned upon the same principle, so far as relates to the power exercised by equity in selling .land to pay debts. But it is useless to follow this point further; for every instance of a sale of land decreed in marshalling assets, is, in substance, an exercise of the same power.
This doctrine of marshalling assets, is a long settled, favourite, and highly cherished branch of equitable jurisdiction. It is founded on the best and purest principles, and productive of that even-handed justice, v< ch to the greatest practicable extent enforces the mí m suum cuique tribuito. It being the object of a cou of equity, that every claimant upon the assets of a decei ?d person, shall be satisfied, as far as such assets can, by any arrangement, consistent with the nature of the respective claims, be applied in satisfaction thereof, it has long been settled, that where one claimant has two fisnds to resort to, and another only one, the first shall resort to that fund on which the second has no lien; or the second shall be pro tanto substituted to this last fund. Thus, if a specialty creditor whose debt binds the real as well as the personal assets, is satisfied out of the personalty, the simple contract creditor shall pro tanto come upon the realty; and equity will decree a sale of it, for the satisfaction of his debt. And legatees shall have the same equity, as against assets descended. Nor is this rule confined to assets: if A. has two mortgages, and B. has one of the same subjects mortgaged to him, *213 B. will be aided by equity, in throwing A. upon that subject which B. cannot touch. Many other cases might be put; but our business is, more immediately, to shew that, in the application of the rule, equity has been long in the constant habit of decreeing sales of real assets for satisfaction of simple contract creditors, where their natural fund has been exhausted by bonds binding the heir: and here the difficulty is to select from the multitude of cases which offer.
The rule has been established, I think, little short of two centuries; and 1 venture to say, that scarcely a book of chancery reports within that time, can be found, which does not contain cases of its exercise. I will not incumber this opinion with too many of them. Charles v. Andrews, 9 Mod. 151. (172-5,) was a bill brought against the heir and executors of Andrews, by the plaintiffs, who were his creditors on simple contract, for an account, and to have their debts paid: the executors of Andrews had paid away his personal assets in satisfying debts by specialty: “ and (it was said) by the constant course of this court, where such debts are discharged out of personal assets, in ease of the lands, then the creditors by simple contract shall stand in the places of the creditors by specialty, to have their debts satisfied, out of the lands. And so it was decreed in this case, and that the lands should be sold for that purpose; and the heir, who was an infant, to join in a conveyance, within six months after he comes of age.” In Lacam v. Mertins, 1 Ves. sen. 312. (1749,) lord Hardwickc says—“ The rule of the court as to marshalling assets, and directing simple contract creditors to stand in the place of specialty creditors pro tanto to receive satisfaction, is a, very just and beneficial rule, and ought to be adhered to; and the court leans and endeavours to bring creditors within that rule, and extends it, that all the creditors may receive satisfaction. Yet it must be as between the real and personal assets of a person deceased; for *214 the court has no right to marshal assets of a person . 0 ... alive; it not being subject to such a jurisdiction of equity till the death. Nor can the court extend this relief to creditors further than the nature of the contract wjqq stlpp01-t it; therefore, it must be a specialty creditor of the person whose assets are in question; such, as might have remedy against both real and personal or either, of the debtor deceased; it not being every specialty creditor, in whose place the simple contract creditors can come to affect the real assets, viz. where the specialty creditor cannot himself affect the assets, as where the heirs are not bound.” In Aldrich v. Cooper, 8 Ves. 382. lord Eldon makes many strong and able remarks upon this rule, that a person, having a double fund, shall not by his option disappoint another, who has but one: among others, he says—“ So also, in a case which this court calls a just distribution of the effects of a deceased person, a simple contract creditor has no manner of hold upon the freehold estate. How then is he allowed in this court effectually to apply it for his satisfaction ? Not upon the ground, that it is assets, either by will, or by contract inter vivos ; but upon the ground, that the. specialty or mortgage creditor having two funds, shall not by his will resort to that, by going to which he will disappoint as just a creditor, who cannot resort to any other. The principle in some degree is, that it shall not depend upon the will of one creditor, to disappoint another.’,’ In Gibbs v. Ougier, 12 Ves. 413. it is laid down, that if the court sees at any period, that creditors by simple contract will be deprived of their debts, by specialty creditors going against their fund, the court will of itself, without being called upon, direct the assets to be marshalled; and sir W. Grant puts this case—“ Suppose it appeared for the first time by the report, that a specialty creditor was paid out of the personal estate; it would not be necessary to file another bill for the purpose of marshalling *215 the assets. The simple contract creditor when filing the bill, might not know that the specialty creditors were paid out of the personal estate.” In all these cases, and others innumerable which I will not add, I find, that in marshalling assets, the power assumed by the courts, is not to sequester the rents and profits of real assets, and out of these to satisfy the claims, nor to inquire what is the proportion of such rents and profits to the debts, a,nd to sell the land only where they would not in a reasonable time discharge the debts: no trace of such proceeding can I discover: but I find that the power exercised, is an immediate and direct sale of the real assets themselves, and an application of the proceeds to the discharge of the debts. This is proved by the whole course of proceeding. Look at the form of a bill to marshal assets : the prayer is, that the simple contract creditors may be declared, entitled to satisfaction out of the real estate, to such amount as the specialty creditors shall have received out of the personalty, a,nd that sufficient parts of the real estate, to raise such amount, may be mortgaged or sold, and the money paid to the simple contract creditors. Look at the decree : it directs, that the lands in the proceedings mentioned, or so much thereof as may be necessary, be sold, and the money applied in payment of the debts of the plaintiffs, in whole if there be enough, or if not, in due proportion; and nothing is said about renting out, or sequestering the rents a,nd profits, and thus discharging the debts. See the form of such decrees, in the note Shiphard, v. Lutwidge, 8 Ves. 29. and Thompson v. Brown, 4 Johns. Ch. Rep. 647. Look also at what the several chancellors who have spoken on this subject, have said; Hardwicke, Camden, Thurlow, Eldon, sir W. Grant. They speak of the application of the real assets in satisfaction of the debts, in such a way as to Leave not a possibility of doubt, that they mean a sale; and they lay down the order in which these assets shall. *216 be applied. Thus, in Donne v. Lewis, 2 Bro. C. C. 263. lord Thurlow states, in respect to the order of affecting assets, that the first fund is the personal estate not specifically bequeathed, or exempted expz-essly or by plain duplication from payment of debts; 2. land expressly devised for (not merely charged with) payment of debts; 3. estates descended; 4. lands charged with the payment of debts.
Several cases are cited to shew, that, under some circumstances, courts of equity do order accounts of rents and profits, and only direct a sale, where these will not, in a convenient time, raise the sums required; and it is from thence argued, that the same course ought to be pursued in marshalling assets; but I consider these as cases of a distinct class, turning on a principle essentially different; cases, where the sole question is what is the true construction of a will or a settlement, under which it is sought to raise portions &c. Thus, in Heycock v. Heycock, 1 Vern. 256. whez-e the lord keeper said, “ he took it to be the law of this court, that whez-e thez-e is a devise of'a sum certain to be raised out of the profits of lands, if the profits will not raise the sum in a convenient time, the court will decree a sale.” This, we see at once, is a mere rule of construction. The court, seeing that the main object is to mise the money, and at a given or in a convenient time, and construing wills most liberally in favour of intent, charges the means in order to ensure the end the testator had in view. So, in the anonymous case, 1 Vern. 104. where it is laid down, that “ Avhere a man devises land for payment of debts and legacies out of the rents and profits of the same, there the trustees, it being in the case of a will, may sell the lands: but if it be to pay debts and legacies out of the annual rents and pz-ofits, there, though it is in the case of a will, the lands shall not be sold: but such words in a deed executed in a man’s lifetime, shall, in neither case, empower the trustees to *217 sell.” This again, is a mere question of construction, the' deed or will giving the law; the one requiring a stricter, the other allowing a more liberal, construction. So, in Sheldon v. Dormer, 2 Vern. 310. upon a marriage settlement, in which a trust was created, to raise £ 5000. for daughters’ portions, out of the rents and profits, the question arose, whether the court could decree a sale of the land ? The lord keeper said, “ we are here upon the construction of a trust, where the intention of the party is to govern; and courts of equity have always, in cases of trust, taken the same rule of expounding trusts, and of pursuing the intention of the parties therein, as in case of wills.” And he decreed a sale, because it was evident that the rents and profits would not raise the sum in the time given. This, again, is a simple inquiry into the intention of the parties to the trust, and a decree to carry it into execution. In Okeden v. Okeden, 1 Atk. 550. a power was given in a will, for raising portions out of the rents and profits of land, lor two illegitimate children; the trustees had abused their trust, and instead of laying up the surplus rents and profits before the children reached the age when they were to receive their portions, had let one of them into possession of the land; the other filed the bill for a sale of such part of the land as would pay his portion: lord Jlardwicke said—“ The intention of the testator is clear to me, that the sum of £ 5000. was to be raised out of the rents and. profits, and not from an absol ute sale, unless from necessity.” After reviewing the cases upon the subject, he said, that if the surplus profits should not be sufficient to answer the purpose, he should be strongly inclined that the estate should be sold to make up the deficiency; and to ascertain this, he ordered a reference to a master, to take an account of the rents and profits of the trust estate accrued since the death of the testator—charging the trustees with such as they had suffered the son to receive. Many more cases of *218 this class might be cited. To me they seem wholly distinct from and unconnected with the cases of marshalling assets, in which the courts decree the sale of lands; and so, they must, I think, have been considered ju¿ges who presided, from the fact, that the same judges, at the same periods of time, were deciding the two classes of cases, without ever mentioning the one as clashing with the other. It may be further remarked, that the course of proceeding in the second class, is strongly illustrative of the different principles on which the court went in the two; for while we find that in marshalling assets, there is never any order to take an account of the rents and profits to ascertain whether there shall be a sale, but the sale is at once decreed, we see, that in those cases of construction, where the propriety of a sale depends on the ability of the land to raise the sum .required in a convenient time, the order for an account of the rents and profits regularly precedes the sale.
Among the english cases, we find a good many where the courts refuse an immediate sale of the lands of infant heirs, upon bills to marshal the assets of the ancestor. This is upon the common law rule, that in the case of lands descended (and in some other cases) it is the privilege of infancy, that the parol shall demur. In Chaplin v. Chaplin, 3 P. Wms. 364. lord Talbot held, that, in the case of lands in fee descending on an infant, the parol shall demur in equity as well as at law, because the infant is equally incapable of defending himself in one court as the other, Thus, in Powell v. Robbins, 7 Ves. 209. in a case for marshalling assets, sir W. Grant says—“ In this case, the defendant, the devisee, is an infant, and therefore I cannot order the estate to be sold until he comes of age. I can only declare that the simple contract creditors are entitled to stand in the place of the specialty creditors; with liberty to apply when ’ the infant comes of age, to have the lands sold, *219 to pay their debts.” This privilege of the infant, however, did not, in equity, extend to all cases. Where there was a trust, the parol would not demur; Uvedale v. Uvedale, 3 Atk. 117. And by subsequent decisions, it has been held, that wherever a charge upon the land was raised, though the descent was not broken, the heir was to be taken as a trustee, and the parol should not demur; by lord Camden, in Silk v. Prime, 1 Bro. C. C. 138. in note; by lord Thurlow, in Pope v. Gwyn, 8 Ves. 28. in note; by lord Eldon, in Shiphard v. Lutwidge, Id. 26. In all these cases, the lands of infants were sold, without waiting till their age, or making any inquiry as to rents and profits. In Thompson v. Brown, 4 Johns. Ch. Rep. 619. we have much of the learning on this subject collected by chancellor Kent. He considers it no objection to the sale of the estate, in marshalling assets, that the defendant is an infant; and in addition to the cases above, relies on a statute of New York, which provides, that in suits at law against the infant heir or devisee, the remedy shall not be suspended by reason of nonage; and thinks the court of chancery within the equity of this statute. Our law on this subject is much more explicit: “ The parol shall not demur, in any suit now depending or hereafter to be brought, in any court of law or equity, by reason of the infancy of the plaintiffs or defendants, or of a.ny or either of them, but the court may nevertheless proceed to judgment or final decree in the same;” 1 Rev. Code, ch. 128. § 32. p. 495.
This review of the english cases seems to me to establish, beyond question, the regular and long settled course there, of selling the lands of deceased persons, to pay their debts binding the land, or to marshal their assets. Whether our practice has conformed to this course, I cannot, on my own frail • memory, say with confidence; but I can sa.y, that such has always been my impression; and I feel the more confident of this, because it struck me as a novelty, when, in the course *220 of the argument of this cause, I heard a doubt suggested of the power of the court to decree a sale in such cases. The question seems seldom to have come before this tribunal. Yet we are not wholly without prece¿ents# In Eppes v. Randolph, 2 Call 103. the chancellor acted upon the principle, in decreeing a sale of the lands to pay the debt of Bevins. In the argument before this court, the english doctrine of marshalling assets was clearly stated by Hay, and taken as the law of the land, and as clearly admitted by Marshall on the other side: and though this court reversed that part of the decree which declared the deeds to Richard and David Randolph void and directed a sale of the lands, because it thought the deeds valid, it sustained the power of sale assumed by the chancellor. In Tinsley v. Oliver’s adm’r, 5 Munf. 419. the surety in a bond of the ancestor, having had judgment against him, and paid it off, filed his bill against the administrator and heirs, praying an account of the personal and real assets, and in case of a deficiency of the personal, that his claim might be charged upon the real estate, either by marshalling assets, or putting him on the footing of a' bond creditor i the chancellor dismissed the bill on the ground, that the plaintiff had a complete remedy at law: but this court reversed the decree, “ being of opinion, that the plaintiff was properly in equity, as well to establish his demand, as for the purpose of having an account of the personal estate, and being permitted to stand in the place of the obligees in the bonds, in the bill mentioned, so as to be paid out of the real assets in default of the personal.” How paid out of the real assets ? Assuredly, according to the course of equity, by sale of the land. This, then, I consider as a direct recognition of the english doctrine on the subject. The case of Blow v. Maynard, 2. Leigh 29. is another case, where, upon examination of this very doctrine, this court unanimously decided for and decreed a sale of the land.
*221 I have shewn from our statute, that infancy presents no obstacle to a sale, as the parol is in no case to demur. The court will in all cases see, that no injustice is done in the execution of its decrees, and especially in the case of infants; but this consideration does not change the course of proceeding, nor lessen the power of the court. 1 think the court had a clear right to decree a sale in the case before us; whether it exercised it discreetly, my brethren will determine. I think the decree should be reversed, for the other errors I have mentioned.
Tucker, P.'
Without adverting to the various errors which have been assigned at the bar, I am of opinion that the decree is erroneous in directing a sale of the land under the circumstances of this case, and yet more in directing such sale to be made for cash.
I begin with the last of these errors, as the examination of it will tend to throw some light upon the first. The statute 1 Rev. Code, ch. 66. ^ 41. p. 204. provides, that the courts of chancery “may, in all cases, at their discretion, where a sale of property is decreed, direct the same to be made for cash, or on such credit and on such terms as may be deemed best.” This discretion, like every other which is vested, in an inferiour tribunal, is subject to the revision and correction of the appellate court; and if it has not been properly exercised, the decree of the court below must be reversed. In this case, I think it cannot be denied that it has been harshly exerted. The patrimony of the infant defendants, consisting of a tract of land of 740 acres, is directed to be sold for cash, to raise the amount of debts chargeable on it, being only 820 dollars. If the discretion to sell on a credit, is ever to be exerted ibr the protection of defendants against ruinous sacrifices, this case presents a claim to that protection. The statute was passed, in consequence of the ruinous sacrifices which were so *222 frequent anteriour to its enactment, in the execution of decrees in chancery for the sale of real estate. It was enacted in broad terms, which comprehend even those cases where by the execution of a specific lien, such as a mortgage, the debtor had subjected his real estate to sale, under the ordinary proceeding of a bill of foreclosure. And if, in such case, the recovery of the creditor ought to be suspended, rather than subject the debtor to a ruinous sacrifice, much more are the debtors here entitled to the indulgence of the court, where the parties defendant are infants, and where the plaintiffs come to ask the aid of the court to marshal assets in their favour, and to accelerate the payment of their debts by a sale, instead of leaving them to the tedious operation of their discharge out of the annual rents and profits. In such a case, the reasons are peculiarly strong for the application of the discretion, vested by the statute, in a manner calculated to protect the infant defendants from unnecessary loss, and perhaps from absolute ruin.
I am of opinion, therefore, that if a sale was proper in this case, it should have been directed to be made on a reasonable credit. Had this been done, it is problematical, whether the recovery by the plaintiffs would have been materially accelerated; since their debts could have been discharged from the rents and profits themselves, within a very short time. We are brought then to the consideration of the question, whether under the circumstances of this case, the court should have directed a sale of the real estate for the satisfaction of the debts.
What are those -circumstances? The debts of the ancestor of the defendants, chargeable on the lands descended, amounted to 820 dollars. The land consisted of 740 acres; and its annual value was 400 dollars, as ascertained by the commissioner, under the special order of the court. Allowing one third of this annual value to the widow, there would be left 206 dollars, as *223 the animal value chargeable with the debts, which would have discharged the debts in some three or four years. Under these circumstances, it was unreasonable, I think, to decree a sale of the real estate of the infant defendants, as the debts could have been discharged, in a rea.sonable time, by the perception of the rents and profits; indeed, almost as soon, as if a sale upon the usual credit had been ordered by the court.
I do not deny, that on a bill to marshal assets, the court has a power to sell the real estate. That power has been often, nay habitually, exercised, though it was very justly said by judge Green, in Blow v. Maynard, 2 Leigh 58. that it was difficult to see the foundation upon which the power rested. The doctrine of marshalling assets stands, as to a simple contract creditor, upon the principle of subrogation. He is but substituted to the rights of the specialty creditors; and it is a solecism, therefore, to suppose he can have greater rights than they have. And as to the bond creditor himself, his rights at law are, to charge the lands in the hands of the heir, and to extend them by a peculiar kind of execution, which directs their value to be ascertained by a jury, and the delivery of them to the creditor at the estimated value, until he shall be paid the debt out of the annual profits. He has no right at law to sell the land, for there is no proceeding known to the courts of law, by which the freehold estate of the debtor can be sold for payment of his debt. If, then, in marshalling the assets, the courts of equity had strictly followed the law, they could only have decreed to the simple contract creditor the possession of the real estate, at its fair valuation, until he should be paid his debt; or the rents and profits might have been sequestered, or a receiver appointed, until out of the rents the debt should be paid. But though the bond creditor at law can only have his extent, there ma,y be considerations, on which a court of equity might inter *224 fere to change the character of his remedy, by a sale of the extended premises. Thus, where the rents and profits are not adequate to keep down the interest, there is every reason for the interference of a court of equity. ag ^ profits do not even pay the interest of the debt, the debt itself must be continually increasing, and thus there is a moral certainty that the debtor can never have the land again. The creditor will have the rents and profits forever, and this, in fact though not in form, is equivalent to the ownership of the fee. It is no invasion, therefore, of the rights of the defendant, nor is it any extension of the rights of the plaintiff, to direct a sale of the premises ; while it is of great moment to the creditor to terminate the uncertainty of his interest, either by enabling him to become the owner of the fee, or by quickening his satisfaction by a sale, and thus enabling him to take all those profits by anticipation, which he had a right to take from year to year, under his extent, forever. It is of importance too, to the community, that these uncertain interests should be terminated, since experience proves, that such estates are generally neglected, and are never improved. Notwithstanding therefore the remark of lord Hardwicke in Higgins v. York Buildings Co. 2 Atk. 107. I have no doubt, that a sale might be decreed even as against the debtor himself, if it should appear, that the rents and profits of the estate by elegit, axe inadequate to keep down the interest of the debt. And so too, against the heir: where the creditor by his bill shews, that the rents and profits of the estate descended are inadequate to the payment of interest, that circumstance will give him . a foundation, on which to ask the interference of equity. He thus shews to that court, that while he has in effect the beneficial interest forever, there is an outstanding formal or nominal title in the heir, which it is reasonable he should get in or extinguish by a sale. Or, to view the case as lord Hardwiclce does, by shew *225 ing that he will be entitled to take all the profits forever, he shews a right to take them all by anticipation, by means of a sale, and thus to quicken the satisfaction of his principal debt, instead of receiving the interest of it only forever. Thus far, the exercise of the power of sale by the court of equity seems altogether reasonable. And even where the rents and profits would be adequate to the gradual discharge of the debt, yet if that object cannot be effected within a reasonable time, there are, perhaps, strong grounds for equitable interference, to be found in this unreasonable delay. Nor is this to the disadvantage of the debtor, who otherwise must be delayed in the enjoyment of any portion of the estate, until the termination of the extent. Be this as it may, it must be admitted, that sales in such cases have been the usual course of the court, in bills either to marshal assets, or to set aside fraudulent conveyances in favour of judgment or bond creditors, alter the debtor’s death. Charles v. Andrews, 9 Mod. 151. 2 Eq. Ca. Abr. 37. pl. 4. 252. pl. 9, S. C. O’Gorman v. Cornyn, 2 Sch. & Lef. 138. Stileman v. Ashdown, 2 Atk. 608. Amb. 13. S. C. Blow v. Maynard, 2 Leigh 29.
But though the power of sale has been asserted and exercised in England, on bills to marshal assets, and though it must be confessed, that there is no such case, in which a previous inquiry has been directed as to the annual value of the land, and its capacity to discharge the debt in a reasonable time; yet, on the other hand, I have found none in which a sale has been decreed, where it appeared that the rents and profits would discharge the debt very promptly. Unless such a case can be shewn, I must rest upon these obvious principles,—that courts of equity cannot give rights to parties, which the law does not give them ; that they cannot even in the extension of the remedies of the creditor, be inattentive to what equity requires towards the debtor; and that in granting a favour to the first, they *226 will not wantonly sacrifice the fortunes of the latter. Where, indeed, it is matter of right, the creditor must have it at whatever sacrifice to the debtor. But where he appeals to equity for its aid, he can only expect that g0 far ag n0£ work injustice and oppression. In assisting him, the court will look with impartial eye to what is due to the debtor, and will mould its remedies, as far as is consistent with the creditor’s rights, so as to prevent unnecessary loss to the owners of the inheritance. This is the true spirit of equity: it is the spirit'of our statute law, which, even in sales under mortgages, authorizes a sale upon credit, and a consequent postponement of the recovery, for the purpose of preventing the ruinous sacrifices attendant upon the sales of real estate under the hammer. Of these sacrifices this case is an example. Near one half of a tract of land which would rent for 400 dollars, has been sold, out and out, for little more than 800 dollars. Had such a case presented itself to lord Hardwiclce, 1 cannot think he would have directed a sale, to the ruin of the infant heirs, where within so short a period the debt might be raised from the rents and profits. While, therefore, I defer to the authorities which have decreed a sale of the realty, on a bill to marshal assets, I must presume, that, in those cases, it did not appear, that the debts could be promptly raised, without any sacrifice on the part of the heirs. Where that does not appear, where the debt cannot be discharged out of the rents and profits within a reasonable time, the precedents must be followed; but where the contrary appears, we are without either reason or precedent to bind us to such a course.
It maybe objected, however, that the rule is too vague and indefinite, which restricts the sale to cases where the debt cannot be made in reasonable time. I do not think so. What is reasonable time is matter of discretion, of every day’s' occurrence in courts of equity. *227 Thus, where there is a devise, subjecting the realty to the payment of debts out of the rents and profits, a sale may be directed if the amount cannot be raised within convenient time. Such was the case of Heycock v. Heycock, 1 Vern. 256. which was a devise to raise a certain sum out of the rents and profits of real estate; and it was declared, that if the profits would not raise the sum in a convenient time, the court would decree a sale. So, in Berry v. Ascham, 2 Vern. 26. there was a devise that the testator’s executors should receive the rents, issues and profits, of real and personal estate, to pay the debts of the testator, and raise portions for his children: the master of the rolls admitted, that there might be a decree for sale of the realty, saying, however, “that there must first be an account of the personalty, and of the rents and profits, and if they were not sufficient to pay the debts in a reasonable time, he would decree a sale.” In Sheldon v. Dormer, 2 Vern. 310. a sale was decreed, expressly on the ground, that the rents and profits would not raise the necessary sum in the time limited, and, indeed, that it could never be done, because the estate charged was defective in value, and the annual profits would not pay the interest. So too, in Okeden v. Okeden, 1 Atk. 550. lord Hardwicke, after stating that the case of Sheldon v. Dormer rested upon the ground, “that the annual rents and profits would not, in a vast tract of time, pay the money, and that even the sale itself -would not answer the charge,” decided, in the case before him, that no sale should be decreed, until it was ascertained by an account, whether the profits would pay off the charge or not. From these cases it is clear, that the probable discharge of the amount to be raised within a reasonable time, out of tlie rents and profits, has been considered as a sufficient objection to a sale; and no difficulty seems to have presented itself on account of the supposed vagueness of the rule. It may also be remarked, that although *228 these cases are not ad idem with the case at bar, they are strongly analogous. To me, indeed, our case appears stronger against a sale. For, if the courts will not decree a sale, even where there is a specific charge ky qie testator for the payment of debts out of the rents and profits, provided they can be satisfied thereout, within a reasonable time; still less should such a decree be made in a case where there is no specific charge, and where the application is only to marshal the assets, the specialty creditor himself having no specific lien on the real estate descended; 2 Leigh 62. Indeed, in the case of Sheldon v. Dormer, the court denied that those cases were like the case of elegit; since, in the elegit, the party must be content with the interest the law gives him, “ and a court of equity has nothing to do to intermeddle.”
Upon the whole, I am of opinion, that the power to decree a sale on a bill to marshal assets, must be considered as qualified by the rule, that, if it appeal’s the debt can be satisfied out of the rents and profits within a reasonable time, a salé, which is generally destructive to the defendant, should not be decreed without his assent. Such has been the usual practice in our chancery courts, as far as I have been conversant with them; and if they even vary herein from english decisions, that variance is justified by the different state of things in the two countries. The redundant capital of Great Britain prevents those ruinous sacrifices upon sales of real estate, which are so common with us; and hence there is less difficulty in making a decree for such sale in the courts of that country. It is otherwise here; and the practice pursued in this case, and which has, I think, been generally adopted, of directing a commissioner to ascertain the annual value of the lands, is salutary and conducive to justice. It is only to be regretted, that the chancellor did not finally decree in the spirit of his prior interlocutory order.