Columbia, April, 1869.

## LAURA E. NANCE *vs.* R. D. NANCE AND ANOTHER.
## MARY W. NANCE *vs.* SAME.

The authorities in this State show that a guardian or other trustee, having funds to invest, may loan them to private persons, provided he takes security. Primarily it is his duty to take, as security, mortgages of unincumbered real estate, of value sufficient to make the fund safe ; and it is only where such real security cannot, with reasonable diligence, be procured, that he may take personal security in lieu thereof. Where personal security is taken, it will devolve upon the guardian or trustee to make the necessity and propriety of such investment appear upon an accounting with his ward, or *cestui que trust.*

The discretion of a trustee, as to the class of securities in which he may make investments, is not unlimited ; and it is only when he acts within the limits of his discretion that the rule applies which relieves him from liability for losses where he has acted in good faith, and with ordinary care and prudence.

Failure of a guardian to report a security as an investment is not conclusive evidence against him, when, upon an accounting, he sets it up as an investment.

Where, upon a loan of trust funds, personal security is taken, it is not conclusive evidence of negligence that the real estate, included in a mortgage taken as additional security, was encumbered at the time.

That a guardian of two wards made investments on their joint account, without distinguishing their several interests in the same, is, of itself, no reason why the investments should be disallowed.

A loan to an individual, without security, will not be sustained, nor can the guardian himself become the surety. (*a.*)

BEFORE JOHNSON, CH., AT NEWBERRY, SEPTEMBER, 1867.

The decree of His Honor the Chancellor is as follows :

JOHNSON, Ch.   Drayton Nance, the father of the complainants, died on the 13th day of September, 1856, leaving of force his last will and testament, of which Frederick Nance and John A. Barksdale were appointed executors, and under authority of which they have nearly administered the whole estate.   In the sixth clause of the will the testator directs his executors to have suitable settlements made upon each of his daughters of all the property which he gives to them in the will, by the Court of Equity.   In requiring this he expresses the desire that such settlement shall be made as liberal as the circumstances of each will justify.   The testator also appointed his brother Frederick Nance testamentary guardian of the complainants, and, in making such appointment, conferred upon him the power to discharge all the duties of a guardian appointed by any of the Courts.

By virtue of such appointment he received the whole of the complainants' estate into his possession, which consisted entirely of money and choses in action.

(*a.*)  Vide *Allen* vs. *Gaillard,* post.

14

Nance vs. Nance.

In 1857 he made a return of his receipts and expenditures, on account of the complainants, to the office of the Commissioner in Equity, and upon being then informed by him that the returns should be made to the office of the Ordinary, afterwards then to that office.

In June, 1863, Frederick Nance died, leaving of force his last will and testament, of which his sons, Robert Drayton Nance and John K. G. Nance, were appointed executors, who have since qualified as such, and have taken possession of his entire estate, and have permitted a large portion of the same to go into the possession of the legatees and devisees; and two of the tracts of land which belonged to his estate have been sold by the devisees, and one of them is in the possession of Edwin G. Simpson, and the other in the possession of Dr. Wm. Philips, who have been made parties to these proceedings by amended bills, for the purpose of requiring them to contribute a portion of the value of the same, if the assets retained by the executors should prove insufficient to meet the recoveries of the complainants in their case.

After the death of Frederick Nance, the pocket book, in which he kept his most important papers, was opened, and in one pocket was found a list of notes belonging to himself, and in another pocket was found a list of notes wrapped in paper, endorsed, in the handwriting of the deceased, " Notes belonging to me as the guardian of L. E. and M. W. Nance. (Signed) F. Nance."

The complainants have filed their bills for the purpose of having their estate accounted for by the executors of their late guardian, and for the purpose of following his estate in the possession of E. G. Simpson and Dr. Philips, if the same should become necessary ; and also for having their estate settled upon them, respectively, in accordance with the directions of their father's will. The matter in relation to the trustees and the proper terms of settlement has been referred to the Commissioner, and he has made his reports on the same, to which no exception has been filed.

The executors of Frederick Nance acknowledge their liability, as such, to account to the complainants for their estate, which went into the hands of their testator, or were retained by him ; but they insist that they still hold two of the notes which he received as a part of their estates, and that their money was invested in the other notes contained in the second " list of notes," and in Greenville and Columbia Railroad scrip, &c.; and that all of which were abundantly good when the investments were made; and that if any

of them are not now good, it has resulted from the casualties of war, and not from any negligence on the part of their testator or themselves; and that they are entitled to credit for the same, in any accounting that may be had, either by turning over the same to the proper parties, for the benefit of the complainants, or by collecting the same, so far as they can, and paying over the proceeds to both parties, as the complainants may prefer.

The complainants, on their part, insist that they are entitled to money decrees for the whole amount of money and assets which went into the possession of their guardian, with interest on the same; subject, however, to payments made by him for their benefit, except for the amount of the note which was given by J. M. Baxter, Esq., which they consent to receive as so much money.

Was there anything imprudent, on the part of the guardian, in retaining notes which were turned over to him as a part of the estate of his testator, for the benefit of his wards, which were good at that time?

Was the money of the complainants invested in the other notes contained in list No. 2, and in the railroad scrip? and, if so, were the investments such as should be sanctioned by this Court? These are the questions which I am called upon to decide in their case.

The notes of L. L. Young and William F. Nance, the former for two thousand five hundred dollars, and the latter for six hundred and forty-seven dollars and seventy-seven cents, both of which were included in list No. 2, were made payable to Frederick Nance, without any reference to his representative character, and were taken by him without any security whatever. The proof is, that each party was good for amount of his note when he gave it; and the notes, so far as I know, are still good. But, supposing the investments to have been made, were they properly made, and can they be allowed? I think not. This Court never orders investments to be made without security of some kind.—*Spear* vs. *Spear*, 9 Rich. Eq., 184.

The only evidence before the Court, in relation to the investments by the guardian of his wards' money in the stock of the Greenville and Columbia Railroad Company, is a certificate by the President of the road, that he, as guardian, was the proprietor of 29 shares of such stock, for each of the complainants, on the 18th day of March, 1859, and a certificate by the Auditor and Treasurer of the road, on the same day, that the guardian had paid an assessment of 20 per cent. on the stock for them, and the fact that this

certificate was found amongst the notes in list No. 2. If I were fully satisfied that the stock had been purchased with the wards' money, at its proper value, which I am not, I would require further evidence to satisfy me that the investments were judicious and could be allowed. The position of the defendants, in relation to this stock, cannot be sustained.

The sealed note of Wm. P. Butler, S. Christie, J. A. Bland and F. Nance, for five thousand dollars, which was found in the list of notes No. 2, was made payable to Robert Dunlap, who was also a ward of F. Nance, or to bearer. The bearer and one of the makers of this note are the same person, and I do not think that a guardian should invest the money of his wards in notes that cannot be collected by the ordinary process of law. My opinion is, that, as an investment for the complainants, it must be rejected.

The sealed note of C. B. Griffin, S. G. Waller and Thos. Spearman, for four hundred and sixteen dollars and fifty-three cents, and the sealed note of G. M. Winn, U. W. Winn, and Wm. Mills, Jr., for seven hundred and eighty-four dollars and four cents, were found in list No. 2, and were given for purchases made at the sale of the property of Drayton Nance, by his executors, and were either retained by the guardian or were turned over to him by his co-executors as so much of the estate of his wards, and they were good at the time they were taken, and, no doubt, would have continued so, had it not been for the late war and its results, for which the guardian was in no wise responsible. The opinion of the Court is, that these notes must be received by the complainants as a part of their estate.

The sealed note of James D. Nance and Silas Johnstone, for two thousand one hundred and thirty-six dollars and thirty-one cents, is made payable to F. Nance, guardian, and was found in list No. 2. This note was, no doubt, taken as an investment for the complainants; and, although there is but one surety to the note, it was so abundantly good at the time that it was taken, and I suppose is still so, that I shall hold that it was a proper investment of so much of the complainants' money, and must be sustained as such.

The sealed note of B. S. James, Wm. East and Samuel East, for two thousand five hundred dollars, is made payable to F. Nance, or bearer, and was found in list No. 2. Wm. East testified that he gave the note for borrowed money, and understood, at the time, that the money belonged to the children of Drayton Nance, and that F. Nance told him afterwards, perhaps in 1863, he could keep the

money till his wards came of age, and that the note was good when it was given, and that he did not regard it, at the time he testified, as being doubtful. I regard the evidence as being sufficient to establish the fact that the money of the complainants was invested in the note; and, also, that the investment was a judicious one, and must be sustained by the Court.

The sealed note of W. P. Butler, S. Christie, Elbert Bland and J. A. Bland, for ten thousand dollars, is made payable to F. Nance, or bearer, and was found in list of notes No. 2. F. W. R. Nance testified that his father, F. Nance, loaned Butler ten thousand dollars, and sent him to Newberry to get the money, and he got eight thousand dollars, but that not being as much as was called for by the note, his father gave him his note for $2,000, as follows: "$2,000. One day after date, I promise to pay to W. P. Butler, or bearer, the sum of two thousand dollars, for value received, this 23d day of Feb., 1859. (Signed) F. Nance, guardian for L. E. and M. W. Nance," to balance with note; and that he afterwards took up the note for his father.

R. Drayton Nance testified that, at the time the money was loaned, it was his understanding that the money was that of the complainants, and that F. Nance, for the purpose of more effectually securing the payment of the same, took a mortgage on twelve hundred acres of land and thirty-five negro slaves, and that, at the time the note was taken, it was abundantly good. There was a good deal of other testimony offered, going to establish the fact that the money of the complainants had been invested in this note; but, as I regard that already referred to as being sufficient to justify that conclusion, I will not allude to any more of it. The judgment of the Court is, that the money of the complainant was invested in the note of Butler, and others, and that the investment, at the time it was made, was judicious, and is sustained by the Court.

So much of the bills and amended bills as seek to subject such portions of the estate of Frederick Nance as have gone into the possession of the devisees or legatees, and, through them, into the possession of other parties, to the payment of any portion of the decree which may be recovered in these cases by the complainants, cannot be considered at this stage of the proceedings, are, therefore, retained for future consideration of the Court, if it should hereafter appear that it is necessary.

It is ordered and decreed, that the above opinion be taken as the judgment of the Court.

It is also ordered and decreed, that it be referred to the Commissioner to take the accounts between the complainants and the estate of their late guardian, and the executors of his estate, and that, in taking such accounts, the amounts due on the notes, which have been sustained as proper investments, be entered as credits for the estate, and that the notes be turned over to their trustee, should they desire to receive them. If not, that the executors do proceed to collect them and pay over to their trustee the proceeds as fast as they may be able to collect the same.

It is also ordered and decreed, that the report of the Commissioner, recommending the terms on which the property of the complainants should be settled, and suggesting that William F. Nance is a fit and proper person to be appointed the trustee of each of them, and recommending his appointment upon certain conditions, be confirmed, and become the judgment of this Court, upon W. F. Nance's giving bonds with sureties, as recommended by the Commissioner.

The plaintiffs appealed, and now moved to modify or reform the decree, upon the grounds:

1. Because the testator of the defendants, Frederick Nance, who was the testamentary guardian of the plaintiffs, never did invest their respective estates, as it was his duty to do, by putting them into a state of security; but mixed up their said estate with his own, and treated their funds as his own, and loaned them out as his own, and in his own name; and, therefore, in equity, should be liable for all losses occasioned thereby; and His Honor erred in not so deciding.

2. Because said testator did not invest the funds of his said wards in safe securities, and report the same to the Court, as required by law; and His Honor erred in not so deciding.

3. Because the Chancellor erred in deciding that a number of notes found in his possession at his death, marked " Laura and Mary's notes," was sufficient evidence that they were investments made for them; which, if evidence for any purpose, would go to show that he had set apart that portion of his own notes, payable to himself, out of which he expected to collect enough to satisfy the demands of his wards; and His Honor erred in not so deciding.

4. Because if their said guardian did have the right to loan out their funds, taking notes payable to himself, without any marks showing said notes belonged to them, or which they could claim in

case of his insolvency, he should have done so only on mortgage of real estate unencumbered, and then only to the extent of two-thirds of the value thereof, which was not done with relation to any of the notes now set up as investments for them, except in the case of William P. Butler, with S. Christie, Elbert Bland and J. A. Bland as the sureties thereto, for the sum of ten thousand dollars; and His Honor erred in deciding that the plaintiffs should take said note as a good investment of their funds.

5. Because the defendants' testator was the guardian of these two plaintiffs, separately and distinctly, and he should not be exonerated by calling certain notes, " Laura and Mary's notes," as it was his duty to have invested them separately, so that each one could have known, at any time, in what her estate was invested; for, although the two cases of the plaintiffs have been tried together, for convenience, they are separate and distinct; and His Honor erred in not so deciding.

6. Because the two sealed notes decided to be proper investments by his Honor, to wit: One given by C. B. Griffin, with S. G. Waller and Thomas Spearman as the sureties thereto, for $416.53, and one given by G. M. Winn, with Upton W. Winn and William Mills, Jr., for $784.04, should not be credited to the account of the guardian as an investment, because, although the said notes were properly received by the guardian as a part of his wards' estate, and at that time good, it was his duty to have kept them good; and His Honor erred in not so deciding.

7. Because one of the notes admitted as an investment by His Honor, that of James D. Nance and Silas Johnstone, for the sum of $2,136.31, was without security, and His Honor erred in supposing that one of the makers was principal, and the other surety, when, in fact, the money was lent to both as joint principals for a joint purpose; but, even if Silas Johnstone had been surety, the note was not secured as required by law and the practice of the Courts of Equity—it never having been reported according to law.

8. Because the sealed note of William East, with B. S. James and Samuel East as sureties, for $2,500, which is payable to F. Nance or bearer—admitted as an investment by His Honor—cannot be sufficiently identified as a part of the estate of either of the plaintiffs, according to the rules and practice of the Courts of Equity—it never having been reported according to law; and, further, because the solvency of the parties, at the time the note was given, has not sufficiently been proved.

9. Because the note of William P. Butler, with S. Christie, Elbert Bland and J. A. Bland, for $10,000, was not, in fact, an investment, and has not been so proved, of so much of the estate of the plaintiffs, or either of them, and that the defendants should not have received credit therefor; and, further, because it has been discovered, since the trial of these causes, that the mortgage given to secure the payment of the said note was inoperative and unavailing as a security, the property embraced in said mortgage being, under the lien of judgments, older than the mortgage, for the satisfaction of which judgments the land embraced in the mortgage has been sold, showing negligence on the part of the guardian, Frederick Nance, to the interest of his wards, even if said note had been an investment and regularly reported as such.

The defendants also appealed, and now moved this Court to modify the decree, on the grounds:

1. Because His Honor erred in not allowing the estate of F. Nance, deceased, credit for the notes of L. L. Young and W. F. Nance as proper investments of the complainants' funds, as the proof establishes the facts, that the complainants' funds were invested in said notes, and that the said notes were perfectly good when taken, and one of them, L. L. Young's, is now good.

2. Because His Honor erred in not allowing the estate of F. Nance credit for the stock in the Greenville and Columbia Railroad Company, as the proof establishes the fact that the said F. Nance received said stock from the estate of complainants' father in a division of his stock in said company, and it was agreed in this case that the complainants should receive this stock as that much of their estate.

3. Because His Honor erred in not allowing the estate of F. Nance, deceased, credit for the amount of the note on W. P. Butler, S. Christie, J. A. Bland and F. Nance, for $5,000, as the evidence shows clearly that this note was perfectly good when taken, and that the funds of the complainants were invested in it.

*Fair*, for plaintiffs.

*Jones, Simpson*, for defendants.

Oct. 9, 1869. The opinion of the Court was delivered by

WILLARD, A. J. · The bills seek to charge the representatives of F. Nance, testamentary guardian of the complainants, with certain

trust funds held by him in that character. The representatives of F. Nance seek to discharge his estate by showing certain invest- ments of that fund, claimed to have been properly and judiciously made, which have been lost, as is alleged, by casualties, not impli- cating the guardian in fault.

The decree establishes certain of these alleged investments, hold- ing them to have been judicious, and disallows others.

The first, second and third grounds of complainants' appeal bring to notice the evidence tending to show that the guardian had kept the funds of his wards invested separately from his private funds, denying its sufficiency. The complainants appear to have fallen into the error of considering the Chancellor as having based his decision, as to the sustained investments, wholly upon the fact that, after the decease of the guardian, the securities in question were found in a parcel by themselves, enveloped, and marked on the envelope, "Notes belonging to me as guardian of L. E. and M. W. Nance." (Signed) F. Nance." This position is advanced by the complainants' third ground of appeal. The Chancellor, in up- holding these investments, based his conclusions, not exclusively upon the testimony indicated by the third ground of complain- ants' appeal, but as well upon additional testimony, and he is not open to the charge of having laid undue or exclusive weight upon the evidence furnished by the envelope of the pack- age of securities. The additional fact that some of the securities enclosed in that envelope were disallowed as investments, shows that his decision did not depend wholly on the mode in which such securities were kept. The evidence bearing on the question of in- vestment is, in part, general, and applicable to all the securities found in the envelope, and, in part, drawn from the circumstances attending particular investments ; and, therefore, can properly be weighed only in its special application to investments respectively.

The first ground of complainants' appeal involves, in addition to the foregoing, a question of law, namely : whether the funds, if in- vested at all, were put in a "state of security."

This proposition of law is more fully stated in the fourth ground of appeal, and is, in substance, that the guardian should have loaned the trust funds "only on mortgage of real estate unencumbered, and then only to the extent of two-thirds of the value thereof." If this proposition is sound it will be decisive against all the investments claimed, for but one of them was upon real security, and, in that case, the land appears to have been previously encumbered, and the

security lost in consequence thereof. This proposition may be viewed in either of two distinct lights: first, as affirming a general rule of law, limiting all investments by guardians and trustees, by way of loan to individuals, to mortgages of real estate of the character contended for; or, second, as affirming that, under the circumstances of this fund, such was the limit of a prudent exercise of the guardian's discretion. The first proposition is one of law purely; the second is a mixed question of law and fact. Is there, in this State, a rule of law requiring real security in all cases of individual loans made by trustees, independent of the circumstances that may surround the trust estate?

In England, it is settled that an investment on personal security alone, whether created by a promissory note or a bond, constitutes a breach of trust, for which the trustee will be personally liable, (Hill on Trustees, 378;) and if he finds the estate coming into his hands to consist wholly, or in part, of personal obligations, it is his duty to call them in and properly invest the fund. (Ib. 380.)

In this State, while the principles of equity from which the English rule was deduced are recognized and enforced, the rule itself has undergone modifications to suit the circumstances of the country. No case is found localizing the English rule on the subject of personal securities within this State, while it is at the same time true that, in no case brought to notice, has the judgment of the Court rested upon any proposition directly sanctioning such modes of investment. It is true, nevertheless, that a considerable weight of judicial opinion, of both an affirmative and negative character, has been advanced in favor of such securities under suitable limitations. In *Spear* vs. *Spear*, (9 Rich. Eq., 184,) Chancellor Wardlaw says: "We are of opinion that the guardian should change, as soon as practicable, the investment of the funds of his wards into public securities, or bonds secured by lien on real estate, or, at least, bonds of third persons, with proper securities."

The bill to which this expression related was, in behalf of the wards, to charge the guardian with moneys loaned to himself, and employed in his mercantile business. This bill was dismissed as prematurely brought, the loan in question having been properly made previous to the guardianship by a former trustee, and time sufficient for changing the investment not having been allowed the guardian after his accession to the guardianship.

If this opinion did not enter into the judgment of the Court, still it is entitled to great weight. One prominent reason for this

is, that it was evidently the deliberate sense of the members of the Court, and intended as a guide to the guardian as to his future conduct, which, if followed, would render a formal expression of the judgment of the Court on the question unnecessary. Another reason for attaching peculiar importance to this declaration arises from the fact that it is the duty of trustees, in selecting investments, to have regard to the considerations that influence the practice of the Courts in the case of investments made under their immediate direction.—Hill on Trustees, 378. In conforming to this rule the trustee would not be justified in overlooking the daily practice of the Court, or in disregarding expressions of opinion, and confining his attention exclusively to the settled judgments of the Court.

It will be observed that the Court, in *Spear* vs. *Spear*, do not give unqualified approbation to personal securities, nor place them strictly on a par with public and real securities. This is very clearly implied by the use of the expression "at least," and is less distinctly shadowed forth in the use of the expression "proper securities," instead of "good and sufficient sureties," the latter expression, *good and sufficient*, being significant of value alone, while the term "proper" carries with it an implication that some degree of technical sufficiency is requisite. What is the true import of the language of the Court will be considered after the general rules applicable to the subject have been noticed.

In *Sweet* vs. *Sweet*, Spear's Eq., 309, the application was to remove a guardian for loaning his wards' money to himself. An order was made dismissing the guardian, which was reversed on appeal. Chancellor Wardlaw, in *Spear* vs. *Spear*, doubtless takes the true view of the case of *Sweet* vs. *Sweet*. He says "the point decided in that case was, simply, that it was insufficient reason for the removal of a guardian from his office that he had employed in his own business the funds of his ward."

He adds, "The Court might have proceeded to direct a change of investment." But the decision, in *Sweet* vs. *Sweet*, is far from absolving the guardian from liability for losses in the case of personal investments. The guardian, in his answer, had contended "that he had as good a right to use the money as to lend it out at interest to others; in which last case he could only have realized the interest, and have been responsible for the funds."—p. 319. Chancellor Johnson appears to have taken the same view, for he says: "I do not know, indeed, how the Court can control a guardian in the use he makes of a money fund. It is not usual, particularly in the

country, to require a guardian to invest funds of inconsiderable amount in government or other public securities; nor is it always practicable to do it to advantage; and there is no alternative but to lend it on bond. In this form it is always under the control of the guardian, *and, in the end, the whole responsibility devolves on him.*"

The Chancellor appears to have regarded investments in personal securities as, at least, an irregularity, affording imperfect protection to trustees, and hardly less objectionable or insecure than direct loans from the guardian to himself. The most noticeable feature of this decision is, that it grounds the propriety of personal invest- ments on the necessity at times arising from the situation of the particular fund, and not upon any general rule of law giving un- qualified approval to that form of security. The criticism on this case, in *Spear* vs. *Spear*, did not touch the general foundation upon which the reasoning of the Chancellor rested, but its application to the case of a loan made by the guardian to himself.

In *Mulligan* vs. *Wallace*, 3 Rich. Eq., 111, the Commissioner in Equity was ordered to invest in personal securities. The question before the Court grew out of the manner in which the Commis- sioner proceeded to execute this order, and did not concern the pro- priety of investments in securities of that class. It is to be pre- sumed that special reasons, or, possibly, the consent of all parties in interest, influenced the terms of the order, so far as it directed the taking of personal securities.

In view of these judicial declarations and action, we cannot hold that the rule of law condemning investments by trustees in personal securities has been fully adopted in this State. In conceding that circumstances may exist justifying such investments, it does not follow that an unnecessary resort to personal securities will be jus- tified. The duty of trustees, in relation to investments, is defined by the objects prompting the creation of the trust, namely : to place the fund in a state of security, and in a condition to yield increase. The resulting duty is to seek, with reasonable diligence and pru- dence, investments affording both security and increase. These principles are recognized in our own Courts in the following cases: In *Spear* vs. *Spear*, already cited, it is said that it is the duty of a trustee "to put the estate committed to him in a state of security." In *Taveau* vs. *Ball*, (1 McC. Ch., 456,) the duty of executors to in- vest the funds in their hands was enforced, and their liability for failure to invest within a reasonable time recognized. The princi-

ple of this decision would apply with still greater force to trustees and guardians; for, while the primary duty of the executor is that of administration, the duty of investing being only subsidiary to it, the primary duty of the trustee and guardian is secure investment. The more difficult question is as to the degree of security requisite. This is to be determined, in part, by settled rules of law, and, in part, through the discretion of the trustee. The Courts have gone no further in the direction of limiting the discretion of trustees than to indicate certain classes of investments as admissible, and to reject others as unsuitable. Within the limits of this imperfectly defined jurisdiction the trustee has been entrusted with a large discretion, and treated with great liberality while acting in good faith and chargeable with no culpable negligence or gross imprudence. . In *Spear* vs. *Spear*, and in *Mulligan* vs. *Wallace*, loans made by a trustee to himself were condemned. In *Morton* vs. *Adams*, (1 Strob. Eq., 72,) he was held not to be authorized to lay out the trust funds in the purchase of real estate. It is held in England that the employment of the trust fund in trade or any speculative undertaking, without an express authority, will be treated as a breach of trust.—Hill on Trustees, 378. The same doctrine was applied by Chancellor Kent, in *Thompson* vs. *Brown*, 4 Johns. Ch., 619. The effect of authorities of this class is to subject the trustee to liability if he invests trust funds, without special authority, in either of these objectionable modes.

A class of cases was pressed upon our attention on the argument as maintaining the doctrine that want of good faith and gross negligence were the only grounds on which trustees could be charged, in the event of a loss of trust funds. The true bearing of these cases was misconceived.

*Boggs* vs. *Adger*, 4 Rich. Eq , 408, is a case strongly illustrative of the grounds on which this proposition of the defendants rests. In that case an attempt was made to charge the guardian with funds lost through investments in stock of the United States Bank. The general question, whether bank stocks, as a class, were suitable security for trust funds, does not appear to have been considered. The prudence of investing in that particular stock was the question brought to the notice of the Court. The question, therefore, was as to the liabilities of trustees for errors of judgment, in cases where they had a. right to the exercise of discretion. The rule laid down by Chancellor Wardlaw is, that a trustee is answerable for those losses only which are occasioned by such acts or omissions

as a prudent man could not do or omit in his own affairs. This rule is referred to the authority of *Taveau* vs. *Ball*, 1 McC., Ch., 464; *Bryan* vs. *Mulligan*, 2 Hill's Ch., 364; *Glover* vs. *Glover*, McM. Eq., 153, and *O'Dell* vs. *Young*, Ib., 155. An examination of these cases will show that the rule, as laid down, was intended to define the responsibility of trustees while acting within the limits of their discretion, and not to give support to the idea that that discretion was unlimited as to the character of investments, and their responsibility measured solely by the purity of their motives and the degree of care exercised in the control of the trust fund. In *Taveau* vs. *Ball* it was held that the executor was justified in selling the produce of a plantation on credit, in conformity to the usages of the country, and was not responsible for a loss arising from the creation of a bad debt, having used due care. The Court say : "When he (the executor) has honestly and faithfully endeavored to acquit himself of his charge, the Court is slow to visit a loss upon him ; having, however, always so much regard to the *cestui que trust* as to prevent negligence and abuse." *Rowth* vs. *Howell*, 3 Ves.; 565, and *Powell* vs. *Evans*, 5 Ves., 839, are given as the authoritative sanction of this language. The Court proceeds to draw from these authorities a rule stated as follows: "The executor should manage the funds committed to his care with the same care and diligence that a prudent and cautious man would bestow on his own concerns." The case did not involve a question of investment, but the propriety of employing the ordinary commercial means of disposing of merchandise, the product of the testator's estate. If anything is wanting to a correct understanding of the language quoted from this case, it will be found in the English authorities, from which it is substantially drawn.

In *Powell* vs. *Evans*, the executor was charged with failing to call in personal securities in which the testator had invested during his lifetime. The Master of the Rolls held that the executor was liable, both on the general ground of having left the funds of infants dependent upon the value of personal securities, and upon special instances of neglect disclosed by the facts of the case. It was, in this case, setting rigid limits to the discretion of trustees as to investments, that language was employed tending to show that the largest liberality, in the case of errors of judgment, is consistent with the interposition of impassable boundaries to the discretion of trustees. The Master of the Rolls says: "The Court is bound to attend with great rigor, on the one hand, to protect persons not

capable of supporting their own interests—which was the case of this plaintiff, having been an infant at the time—and, also, with great tenderness to executors, who are called upon to execute often onerous and difficult trusts, and are entitled to great indulgence, unless neglect is fully proved." Again, he says: " No man who ever sat in this Court has been more averse than I to charge executors who intended fairly to discharge their duty, and more cautious not to hold them liable on slight grounds, thereby deterring others from taking upon them such an office." Such expressions cannot be rightly understood when separated from the spirit of justice that prompted the determination of the case. They display tenderness without weakness, the highest ornament of the judicial mind. In tracing these expressions into our own cases we must not lose sight of the true elements of their legal and moral strength.

In *Rowth* vs. *Howell* it was held that the executor was justified in employing the customary means of safely keeping funds in hand ; and trust funds having been lost by the failure of the banker, with whom they were deposited, the executor was free from responsibility, not being chargeable with any special want of due care. This was treated as a question of prudence, and was a case appropriate for the application of the rule stated in *Boggs* vs. *Adger*, upon the authority of this case, and *Powell* vs. *Evans*. The lights furnished by these English cases · disclose the force of the language of *Boggs* vs. *Adger*.

*Bryan* vs. *Mulligan*, 2 Hill's Ch., 364, involved the right of an executor to ship merchandise, for sale, to a foreign market. It was, therefore, similar to *Taveau* vs. *Ball*, and the same general result was arrived at, namely : that the executor was authorized to conform to the ordinary commercial usages in disposing of merchandise. He was, properly, held not to be chargeable with the consequences of an error of judgment in the selection of the best market for the sale of the produce, which resulted in a loss to the fund.

In *Glover* vs. *Glover* a question of negligence in the collection of debts was presented, and the executor charged on the ground that he knew that the debtor was in failing circumstances and failed to act accordingly. In *Odell* vs. *Young* the liability of a guardian for the solvency of securities taken for a debt due to the ward was considered. In both of the cases last cited the questions were treated as turning on negligence, and expressions similar to those quoted above from *Powell* vs. *Evans* are employed.

Thus it appears that the rule laid down in *Boggs* vs. *Adger* was drawn exclusively from cases involving questions either of error of judgment or of negligence, and had no reference to the more general question whether the rules of law precluded certain investments as altogether unsuited to the nature of the trusts to which the fund was devoted.

The next case to be noticed, in connection with the general proposition advanced by the defendants under consideration, is *Hext* vs. *Porcher*, (1 Strob. Eq., 170.) The question in this case, as well as in *Cooper* vs. *Day*, (1 Rich. Eq., 26,) intimately connected with it, was, whether the trustee was liable for failing to record a deed of trust lands. In the former case it was held that he had committed a justifiable mistake, while in the latter he was charged with culpable negligence. The expressions employed in *Hext* vs. *Porcher*, to illustrate the protection afforded to trustees acting within the limits of a fair discretion, remind us of the language of *Powell* vs. *Evans*, and are to be understood under the same limitations. The question, whether the discretion of trustees as to investments was limited, was not either directly or indirectly before the Court, and its language cannot, with fairness, be extended to cover the doctrine advanced by the defendants.

The result of the cases in our own Courts, properly understood in their relation to the general principles of law determining the duties and responsibilities of guardians and trustees in case of investments of trust funds, prevailing in England as well as in this State, may be stated as follows: The trustee will be held responsible for losses of trust funds through loans to private persons, unless securities are taken collateral to such loans. Such securities should primarily consist of mortgages of unencumbered real estate of a value sufficient to guaranty the debt against all contingencies liable to occur, or capable of being foreseen. Bonds of individuals should not be taken in lieu of real securities, unless unobjectionable investments cannot, in the exercise of reasonable diligence, be procured. When personal securities are taken in lieu of real, it will devolve upon the trustee to make the necessity and propriety of such investments appear upon an accounting with the *cestuis que trust.*

The foregoing observations do not apply to loans made on public securities, nor to cases where the investment is, in neither form nor substance, a loan.

The deductions are in harmony with the objects intended to be

secured by the creation of trusts designed to create and apply an income. Trustees are not called upon to obtain, for the funds in their hands, a greater rate of increase than that which is afforded by the most secure investments of the country. If they seek to enhance the product of the fund by assuming speculative risks, they do it at their peril. If they take securities of an inferior class, while better can be obtained, without any profit therefor to the *cestui que trust*, they clearly disregard the plainest dictates of duty.

In applying the foregoing principles to the present case, it should be observed that the Chancellor has decreed that certain investments in personal securities are judicious, and, unless ground is found for reversing that conclusion, it must be regarded that, as to such investments, the circumstances surrounding the trust fund justified the taking of that class of securities. It remains, therefore, only to consider the special matters brought up by the appeals.

The proposition brought up by complainants' sixth ground of appeal is, that the guardian should be charged for not keeping good certain securities originally good. The complainants have not laid a sufficient foundation in fact to charge the trustee with negligence in connection with the deterioration of the value of those securities, and no ground exists for reversing the conclusions of the Chancellor on this point.

The objection, in complainants' seventh ground of appeal, to the sealed note of J. D. Nance and S. Johnstone, that Johnstone signed as principal, and not as surety, is not sustained by the testimony of Johnstone; the only reasonable inference from which establishes the opposite conclusion.

In regard to the East note, referred to in complainants' eighth ground of appeal, the proposition is, that the identification of this note as part of the wards' estate fails: first, because it was not reported as such by the guardian; second, because the solvency of the parties, at the time the note was given, was not sufficiently proven. The failure to report the security is not, in itself, conclusive; it is only a circumstance to be weighed among others. The conclusions of the Chancellor are not open to objection for the reasons stated in this ground of appeal. There certainly was evidence from which the conclusion might be drawn that this note was taken as an investment, and also that it was well secured when taken.

The ninth ground of appeal relates to the Butler note for $10,000. The evidence sufficiently sustains the conclusions of the decree,

that this note was, in point of fact, an investment of the trust fund. The objection that the mortgage taken to secure collaterally this note was "inoperative and unavailing as a security," in consequence of the property having been previously incumbered, and that such security became lost through such previous incumbrance, would have been in point, had that mortgage constituted the only security for the loan; but the fact is, that personal securities were given, as in the other investments considered, and the mortgage appears to have been added thereto, for what it might prove to be worth. The charge of negligence against the trustee, in reference to this investment, is not sufficiently made out.

Having disposed of the important legal question involved in the complainants' appeal, and having examined the special objections to the decree, based on the allowance of certain investments, the matter of the first five grounds of the complainants' appeal is substantially disposed of, with the exception of the proposition advanced by the fifth ground. This proposition is not very distinctly presented, but amounts to a claim that investments made by the trustee for the joint account of the two wards, without distinguishing their several interests in the same, are for this reason to be disallowed. We know of no principle from which such a conclusion can be deduced. If the estate has sustained a loss for any such reason, and that loss can be traced to culpable negligence on the part of the trustee, such a state of facts should be presented directly; it cannot be made out argumentatively in absence of such a statement.

Defendants' first ground of appeal involves the proposition that investments made without sureties are good. This proposition, we have seen, is unsound.

Defendants' second ground of appeal affirms the fact that the proofs established the fact that the guardian received certain stock of the Greenville and Columbia Railroad Company from the estate of complainants' father, on a division of his stock in said company. "It was agreed, in this case, that the complainants should receive the stock as that much of their estate." We do not find evidence that would warrant us in holding that the Chancellor was bound, from the facts before him, to arrive at such a conclusion. We see no ground of disturbing his findings in this part of defendants' appeal.

Defendants' third ground of appeal rests on the proposition that the guardian may become a surety on a loan of trust funds. The

same reasons which, as we have seen, prevent him from lending to himself, precludes him from lending on his own collateral obligation. By whatever means the note became placed in the amount of the trust funds, whether by original investment or as an appropriation made by the guardian out of the other trust funds held by him, or from his personal estate, the transaction is equally open to the objection on which the Chancellor based this part of his decree.

The appeals will be dismissed.

*Moses*, C. J., concurred.